JORY C. STEELE (CA. STATE BAR NO. 206944)
LINNEA L. NELSON (CA. STATE BAR NO. 278960)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA  94111
Telephone:    415-621-2493
Facsimile:    415-255-1478
Email: jsteele@aclunc.org

MICHAEL HARRIS (CA STATE BAR NO. 118234)
NATIONAL CENTER FOR YOUTH LAW
405 14th Street, Floor 15
Oakland, CA  94612
Telephone:    510-835-8098
Facsimile:    510-835-8099
Email: mharris@youthlaw.org

Attorneys for Plaintiffs

[ADDITIONAL COUNSEL ON FOLLOWING PAGE]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JESSICA K., by and through her guardian ad litem BRIANNA K.; ASHLEY W., by and through her guardian ad litem CLEO W.; ANTHONY J., by and through his guardian ad litem MAYA J.; and ALEXIS R., by and through her guardian ad litem ANNA R., <br><br> Plaintiffs, <br><br> v. <br><br> EUREKA CITY SCHOOLS DISTRICT; JOHN FULLERTON, FRAN TAPLIN, WENDY DAVIS, HENRY BECK, SUSAN JOHNSON, MEMBERS OF THE EUREKA CITY SCHOOLS DISTRICT SCHOOL BOARD; FRED VAN VLECK, SUPERINTENDENT OF SCHOOLS FOR EUREKA CITY SCHOOLS DISTRICT; LAURIE ALEXANDER, DIRECTOR OF STUDENT WELFARE AND ATTENDANCE; JAN SCHMIDT, PRINCIPAL, ZANE MIDDLE SCHOOL; DENNIS SCOTT, PRINCIPAL, ZANE MIDDLE SCHOOL; RONALD PERRY, VICE PRINCIPAL, ZANE MIDDLE SCHOOL; RICK JORDAN, PRINCIPAL, EUREKA HIGH SCHOOL; MARTIN GODDI, VICE PRINCIPAL, EUREKA HIGH SCHOOL; and DOES 1 through 100, inclusive, <br><br> Defendants. | Case No.: <br><br> COMPLAINT <br><br> **DEMAND FOR JURY TRIAL** |

JOSÉ R. ALLEN (CA. STATE BAR NO. 122742)
CARRIE LEROY (CA. STATE BAR NO. 209706)
PRO BONO COUNSEL
525 University Avenue, Suite 1400
Palo Alto, CA  94301
Telephone: (650) 470-4500
Facsimile:  (650) 470-4570
Email: jrallen@probonolaw.com

Attorneys for Plaintiffs

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PRELIMINARY STATEMENT**

1.      Plaintiffs Jessica K., Ashley W., Anthony J., and Alexis R., four students who attend schools within the Eureka City Schools District ("District"), bring this civil rights action after experiencing years of intentional discrimination by the District based on their race, sex, and disability status.  Defendants have intentionally discriminated and continue to intentionally discriminate against Plaintiffs by perpetuating a racially and sexually hostile environment in District schools, and by failing to properly evaluate, identify, and accommodate students with disabilities, in violation of the U.S. Constitution, and federal and state civil rights laws.

2.      Defendants have subjected and continue to subject Black and Native American students to a racially hostile educational environment by engaging in and allowing pervasive racial harassment, disproportionately and unfairly disciplining Black and Native American students, disproportionately pushing Native American students out of District schools and into alternative schools, and providing racially offensive and culturally denigrating curricula in District schools.

3.      Blatant racial harassment occurs daily in District schools.  White students frequently use racial slurs, calling Black students "niggers," and making comments such as, "Black girls grow up to be whores."  Although students regularly utter these slurs in class and in school hallways, school staff do not stop them.  Not only do school staff allow students to use racial slurs in their presence, but school staff also make derogatory comments, such as, "Black people get bored easily."  White students also regularly threaten and inflict violence on students of color.  Inside District schools, Jessica K. and Anthony J. have been assaulted by White students.  Despite reports to District staff of such assaults, the White students have not been disciplined by District staff.

4.      Defendants also maintain a racially hostile environment at District schools by disciplining Black and Native American students differently and more harshly than White students.  Jessica K. was removed from class and given a disciplinary referral for coughing in class the day after she had a serious asthma attack.  Ashley W. and the only other Black student in her class were frequently sent out of the classroom for talking or laughing, while White students were not disciplined for the same behaviors.  Plaintiffs' experience reflects a District-wide pattern and practice of disproportionately disciplining Black and Native American students.  During the 2011-

1  2012 school year, of the seven schools for which the District produced data, five of those schools

2  show significant disparities in discipline: Black students were suspended at five times their rate of

3  enrollment at two District schools and three times their rate of enrollment at three schools.  Native

4  American students were suspended at three times their rate of enrollment at three District schools

5  and two times their rate of enrollment at two schools.

6      5.    Defendants also unfairly deny Native American students equal educational

7  opportunities by pushing them out of District schools and into the Humboldt County Office of

8  Education's community school system at disproportionately high rates.  County-run community

9  schools are designed for high-risk youth, many of whom have had run-ins with the law; and these

10  schools do not provide coursework appropriate for students who plan to attend college.  The

11  District wrongfully pushed Alexis R. out to a county community school for credit recovery, rather

12  than for serious behavioral or other similar issues that typically result in students' transfer to

13  community schools.  Alexis R.'s experience exemplifies District-wide discrimination.  During the

14  2011-2012 school year, Defendants transferred Native American students to Eureka Community

15  School at such a high rate that their enrollment there was three times more than their District

16  enrollment.

17      6.    Further, Defendants have created and continue to create a racially hostile

18  environment by ignoring or actively affronting the racial and cultural history of Native American

19  and Black students through the District curriculum and school activities.  District school

20  curriculum includes materials that use the words "savage," "negro," and "nigger," yet school staff

21  fail to discuss the offensiveness or historical context of these terms.  Absent such context, when

22  these words are used in curricular materials, White students often turn to stare at or taunt Black

23  students, and Native American students are made to feel ashamed of their culture.

24      7.    Defendants also subject Jessica K. and Ashley W. to a sexually hostile educational

25  environment by failing to prevent or address sexual harassment against them.  Physical and verbal

26  sexual harassment is ingrained in the culture of District schools through the weekly traditions of

27  "Titty-Twisting Tuesdays" and "Slap-Ass Fridays," where students assault other students by hitting

28  or grabbing their nipples, breasts, and buttocks in the hallways, locker rooms, and other areas of the

1  school.  District staff witness and sometimes even participate in these practices, demonstrating to

2  students that sexual harassment is acceptable in District schools.  Students also verbally harass

3  female students.  For example, Jessica K. is regularly told that she is a "hooker," "whore," or

4  "slut."  Although Defendants are aware of the rampant sexual harassment at District schools, they

5  have failed to take reasonable and effective steps to address it.

6         8.  Defendants discriminate against students with disabilities by failing to provide equal

7  access to education by properly evaluating their needs and identifying them as students who need

8  accommodations and modifications to access education.  Despite Plaintiffs' own identification of

9  their needs and requests for assessment and services, Defendants failed to make even minimal

10  accommodations for the identified disability-related needs of District students such as Jessica K.

11  and Alexis R.

12         9.  In addition, District schools attempt to force families to identify and seek out

13  assessments for students with disabilities themselves, despite the District's obligation under federal

14  and state law to provide such assessments at no cost.  For example, Defendants told Jessica K.'s

15  mother that she would have to pay $350 to obtain an outside assessment of Jessica K.'s disability

16  before the school would create a plan to provide accommodations.

17        10.  Defendants also push out students with disabilities from District schools to

18  alternative schools at disproportionately high rates, by denying students the supports that would

19  allow them to access education in regular schools.  For example, Defendants made no effort to

20  evaluate Alexis R. for a possible disability before involuntarily transferring her to a community

21  school.

22        11.  Defendants have failed to take effective action to remedy the hostile educational

23  environment and discrimination at District schools.  Plaintiffs have complained many times to

24  Defendants through meetings with District staff, phone calls, emails, and school complaint

25  procedures.  Ashley W. and Cleo W. met with Defendants at least once a month for more than an

26  entire school year to discuss concerns about the hostile educational environment in District schools.

27  Between December 2012 and November 2013, Jessica K.'s mother has had at least thirty

28  communications with Defendants about harassment of her daughter.  Defendants have either

1  ignored these complaints completely, or have taken inadequate steps that have failed to address
2  pervasive harassment and discrimination.  Despite Plaintiffs' numerous attempts to address the
3  hostile educational environment, it continues to this day.

4      12.     The hostile educational environment at District schools has caused Jessica K.,
5  Ashley W., Anthony J., and Alexis R. to suffer from anxiety and depression, and to become angry
6  and withdrawn.  Jessica K., Ashley W., and Alexis R. have experienced a decline in academic
7  achievement.  Ashley W., Jessica K., and Anthony J. have stayed home from school and accrued
8  unnecessary absences to avoid the harassment.  Ashley W., Jessica K., and Anthony J. have been
9  disciplined unfairly, causing them to miss additional classroom time.  All of the Plaintiffs fear
10  going to school because they believe that no one will protect them from the discrimination and
11  harassment they experience in District schools.

12      13.     Plaintiffs seek a declaration that the District is in violation of the U.S. Constitution,
13  federal and state law, injunctive relief to ensure that they and other District students are free from
14  discrimination and harassment in the future, and an award of monetary damages, costs, and
15  attorneys' fees.

16                                  **PARTIES**

17      14.     Plaintiffs in this action are Black or Native American students attending school in
18  the Eureka City Schools District, City of Eureka, County of Humboldt, State of California.  As
19  alleged below, Plaintiffs have been subjected to a hostile educational environment based on their
20  race, gender, or disability status.  Because of the highly charged and sensitive nature of the
21  allegations, Plaintiffs have used pseudonyms to avoid further discrimination, harassment, stigma,
22  retaliation, and violence.

23      15.     Plaintiff Jessica K. is a thirteen-year-old Black female student.  Jessica K. lives in
24  Eureka, California, and has attended District schools since August 2012, when she entered the
25  seventh grade at Zane Middle School ("Zane").  She is now in the eighth grade at Zane.  Brianna
26  K. is Jessica K.'s mother and, by petition to this Court, has sought to be appointed guardian ad
27  litem of Jessica K.

28

16.     Plaintiff Anthony J. is a fourteen-year-old Black male student.  Anthony J. lives in Eureka, California.  During the 2010-2011 school year, Anthony J. attended Alice Birney Elementary School ("Alice Birney").  From fall 2011 to June 2013, he attended Zane.  Anthony J. now attends Eureka High School ("Eureka High").  Maya J. is Anthony J.'s grandmother and legal guardian and, by petition to this Court, has sought to be appointed guardian ad litem of Anthony J.

17.     Plaintiff Ashley W. is a fifteen-year-old Black female student.  Ashley W. lives in Eureka, California, and has attended District schools since 2010.  She attended Zane from fall 2011 through June 2013, where she completed seventh and eighth grades.  Ashley W. is now in the ninth grade at Eureka High.  Cleo W. is Ashley W.'s mother and, by petition to this Court, has sought to be appointed guardian ad litem of Ashley W.

18.     Plaintiff Alexis R. is a sixteen-year-old Native American female student.  Alexis R. lives in Eureka, California and is a member of the Yurok Tribe, a Native American tribe that is indigenous to the area around Eureka, California.  She has previously attended Alice Birney, Winship Middle School, Zane, and Eureka Community School Educational Resource Center ("ERC").  She is now in the eleventh grade at Eureka High.  Anna R. is Alexis R.'s mother and, by petition to this Court, has sought to be appointed guardian ad litem of Alexis R.

19.     Defendant Eureka City Schools District is a public school district organized and operating under the laws of the State of California.  A portion of the funding for each of the District's schools comes from the state and federal governments.

20.     Defendants John Fullerton, Fran Taplin, Wendy Davis, Henry Beck, and Susan Johnson are, or were at all relevant times, members of the District School Board.  They are sued in their official capacity.  For purposes of the Unruh Act, these Defendants are also sued in their individual capacity.

21.     Defendant Fred Van Vleck is the Superintendent of Schools for the District.

22.     Defendant Laurie Alexander is the Director of Student Welfare and Attendance of the District.

23.     Defendant Jan Schmidt became the Principal at Zane Middle School during the 2012-13 school year and is currently the Principal.

5

24.    Defendant Dennis Scott was the Principal at Zane Middle School during the 2011-2012 school year.

25.    Defendant Martin Goddi was the Vice Principal at Zane Middle School during the 2011-2012 school year and from August 2012 to December 2012.  He has been the Vice Principal at Eureka High School from January 2013 to the present.

26.    Defendant Rick Jordan is the Principal of Eureka High School.

27.    Defendant Ronald Perry has been the Vice Principal of Zane Middle School from January 2013 to the present.  He was the Vice Principal of Eureka High School during the 2012-2013 school year.

28.    At all times relevant to this action, Defendants Van Vleck, Alexander, Schmidt, Scott, Goddi, Jordan, and Perry are or were individuals working as employees, agents, and supervisors of the District.  These Defendants are all sued in their official capacity.  For purposes of the Unruh Act, these Defendants are also sued in their individual capacity.

29.    The Defendants named individually in paragraphs 20 through 28 above were responsible either for making policy or for implementing and enforcing disciplinary, harassment, and anti-discrimination laws and policies.

30.    The true names and official capacities of Defendants designated as Does 1 through 100, inclusive, are unknown to Plaintiffs, who therefore sue these Defendants by fictitious names. Plaintiffs will seek leave of Court to amend their complaint to show the true names and capacities of these Defendants when they have been ascertained.  All of these Defendants are sued in their official and individual capacities.

31.    Plaintiffs allege upon information and belief that, at all relevant times, each and every individual Defendant was the agent or employee of the District, was acting within the course and scope of such agency or employment, and was acting with the authorization of the District. Plaintiffs further allege on information and belief that all of the actions alleged in the complaint were taken pursuant to the customs, policies, and practices of the District.

32.    Plaintiffs allege upon information and belief that each of the Defendants, including Defendants Does 1 through 100, inclusive, performed, participated in, aided, and/or abetted in

1 some manner the acts and omissions averred herein, proximately caused the damages averred

2 below, and are liable to Plaintiffs for the damages and other relief sought herein.

3                                    **JURISDICTION**

4          33.     This action for declaratory and injunctive relief arises under 42 U.S.C. § 1983, the

5 Fourteenth Amendment to the United States Constitution, Title VI of the Civil Rights Act of 1964,

6 Title IX of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, 25 U.S.C. § 455, Title II of the

7 Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, Section 504 of the Rehabilitation Act,

8 29 U.S.C. § 794 *et seq.*, California Government Code § 11135 *et seq.*, and California Civil Code

9 § 51.  This action also seeks damages under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794

10 *et seq.*, and California Civil Code § 51 *et seq.*

11         34.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and

12 1367, because the matters in controversy arise under the Constitution and laws of the United States.

13 Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights of the

14 parties and to grant all further relief deemed necessary and proper.  The Court's exercise of

15 supplemental jurisdiction over Plaintiffs' claims under state law is proper, as the state law claims

16 "are so related to [Plaintiffs' federal claims] that they form part of the same case or

17 controversy[.]"  28 U.S.C. § 1367(a).

18         35.     In compliance with California Government Code § 910 *et seq.*, the Plaintiffs have

19 filed administrative claims for damages under the California Government Claims Act with the

20 District.  The claims have been rejected by the District.

21                                       **VENUE**

22         36.     Venue is proper in this action pursuant to 28 U.S.C. §§ 1391(b) and 1392, because

23 the events which give rise to Plaintiffs' claims took place within the Northern District of

24 California.  At all relevant times, Plaintiffs were students within the Eureka City Schools District in

25 Humboldt County, California.

26                            **INTRADISTRICT ASSIGNMENT**

27         37.     This civil action arises in Humboldt County and therefore is to be assigned to the

28 San Francisco Division or the Oakland Division of this Court pursuant to Civil L.R. 3-2(d).

**GENERAL ALLEGATIONS**

38.     Plaintiffs have experienced years of intentional discrimination by District staff based on their race, sex, and disability status.  Defendants have and continue to intentionally discriminate against Plaintiffs by perpetuating a racially and sexually hostile environment in District schools, and by failing to provide students with disabilities equal and meaningful access to education.

39.     Defendants' intentionally discriminatory treatment of Plaintiffs represents a District-wide and pervasive practice of discrimination against Black and Native American students.

**RACIAL DISCRIMINATION**

40.     Defendants discipline and exclude Black and Native American students from school at a much higher rate than White students.  For example, during the 2011-2012 school year, the District's own records show that Black students were suspended at over five times the rate of their enrollment at Zane and Washington Elementary, and over three times their rate of enrollment at Grant Elementary, Lafayette Elementary, and Eureka High.  Native American students were suspended at almost three times their rate of enrollment at Zane, Washington Elementary, and Zoe Barnum, and at approximately twice their rate of enrollment at Eureka High and Lafayette Elementary.  White students were suspended at rates at or around their rates of enrollment.  Upon information and belief, the District is aware that Black and Native American students are disproportionately excluded from its schools and has done nothing to address the disparity.

41.     Defendants also push Native American students out of District schools and into county community schools run by the Humboldt County Board of Education, and other alternative schools, at higher rates than similarly situated White students.  During the 2011-2012 school year, the rate of enrollment of Native American students at the county-run Eureka Community School was three times the rate of their enrollment in the District.  The rate of enrollment at Eureka Community School of students from every other racial group in the District is at or well below their rate of enrollment in the District.  Similarly, the District enrolls Native American high school students at Zoe Barnum Continuation School ("Zoe Barnum"), another alternative school, at a rate nearly three times their enrollment in the District.

42.     These alternative schools provide significantly inferior educational opportunities to students, as they provide fewer hours of instruction, few or no extracurricular opportunities, and do not provide the coursework necessary to prepare students for college, including the basic "A-G requirements" for entry into California State Universities and schools in the University of California system.  By California law, county community schools are intended for "high-risk" students who have been expelled, referred through the county probation department, or referred by the school attendance review board.  Upon information and belief, District schools transfer Native American students to alternative schools for reasons not contemplated by the statutes governing community schools, including credit recovery, as a means of disciplining students, and as an alternative to providing services and educational supports that students need and to which they are legally entitled.

43.     Defendants have also created and maintained curricula in District schools that either ignore the racial and cultural histories of Black and Native American students, or are offensive and denigrating to Black and Native American students.  One teacher at Eureka High School had her history students "make up" different Native American tribes and then pretend to fight each other to teach her students that this was how Native Americans traditionally resolved conflict between their communities.  This lesson was both wildly inaccurate and extremely insulting to her Native American students.  The inaccuracy of the curriculum and failure to properly address Native American history is particularly troubling, given the large population of Yurok, Hoopa, and Wiyot tribe members in the Eureka area, and given the history of marginalization and violence in the region.  For example, in 1860, White men murdered approximately 80-250 Wiyot men, women, and children with clubs, knives, hatchets, and guns on Indian Island, an island close to Eureka.  This and other massacres of Native American people in and near Humboldt County continue to be a source of tremendous historical trauma and pain for people in local Native American communities.  Rich educational resources on Native American history are easily accessible from local tribes and nearby Humboldt State University, but are largely ignored or misused in District schools.

1   44.    Ignoring and failing to support the cultural identities of students harms their

2   educational achievement.  Research shows that

3
> [C]ivil rights and cultural identities [of Native American students]
> are often at risk in the educational environment. . . . Native American
> students experience difficulty maintaining rapport with teachers and
> establishing relationships with other students; feelings of isolation;
> racist threats; and frequent suspension. . . . These circumstances arise
> in environments that do not uphold the education rights of Native
> American students or recognize their cultural backgrounds. . . .
> Conversely, students are more likely to thrive in environments that
> support their cultural identities. . . . The importance of such
> environments cannot be overstated.

9   U.S. Comm'n on Civil Rights, "A Quiet Crisis: Federal Funding and Unmet Needs in Indian

10  Country" at 84-85 (2003).

11  **SEXUAL DISCRIMINATION**

12   45.    The District also has allowed the creation of a sexually hostile environment that

13  denies female students access to equal educational opportunities.  From the time Jessica K. began

14  attending District schools, and continuing to the present, she was continually subjected to a hostile

15  educational environment on the basis of gender, including unwelcome verbal provocations and

16  physical conduct of a sexual nature.  Ashley W. was also continually subjected to a hostile

17  educational environment on the basis of gender, including unwelcome verbal harassment and

18  physical conduct of a sexual nature.  The harassment occurred and continues to occur during school

19  hours and on school grounds.  Defendants were repeatedly made aware of, and in some instances,

20  witnessed, the sexually hostile educational environment these Plaintiffs faced.  Defendants'

21  responses were inadequate to address this hostile educational environment and were clearly

22  unreasonable in light of the known circumstances.

23   46.    Since at least the 2012-2013 school year, and continuing until the present, each

24  week students at Zane target each other for "Slap Ass Friday."  On "Slap Ass Fridays," students

25  slap each other's buttocks as hard as they can in public areas on Zane's campus.  So many Zane

26  students participate in "Slap Ass Fridays" that some female students intentionally wear jeans with

27  rhinestones on their back pockets to dissuade others from hitting their buttocks.  Zane

28  administrators and staff are aware of "Slap Ass Fridays," yet they continue to let students assault

others without imposing consequences sufficient to end the practice.  Certain Defendants have personally observed students slapping each other's buttocks in the office, school hallways, classrooms, and on the "quad" where students congregate during lunchtime.  Indeed, students have gone so far as to assault staff; students have slapped the buttocks of school administrators and female teachers, and Defendants have failed to take steps to stop this behavior.

47.   Throughout Jessica K.'s attendance at Zane, students have also targeted each other for "Titty Twisting Tuesdays."  During these events, students grab each other's nipples or punch each other in the chest.  Female students are often targeted in Zane's locker rooms, where harassers punch victims in the chest when they are only wearing bras, making the assault more painful.

**DISABILITY DISCRIMINATION**

48.   Defendants also fail to provide students with disabilities meaningful access to education.  Rather than identifying and providing accommodations and modifications that would enable students to succeed in District schools, Defendants disproportionately suspend and push out students with disabilities to alternative schools.  The combined effect of race and disability is staggering.  For example, at Alice Birney, 90% of the Black students and 50% of the Native American students who were suspended had identified disabilities, while only 26% of White students who were suspended had identified disabilities.  At Washington Elementary, 100% of Black students who were suspended had identified disabilities, while only 24% of White students who were suspended had identified disabilities.

**THE EXPERIENCES OF INDIVIDUAL PLAINTIFFS**

**RACIAL DISCRIMINATION**

**JESSICA K.**

49.   From September 2012 through the present, Defendants have intentionally discriminated against Jessica K. by subjecting her to a racially hostile educational environment.

50.   Jessica K. experiences almost daily her classmates' use of racial slurs in school hallways, classrooms, and other common spaces at Zane.  Before starting at Zane, Jessica K. had never heard the word "nigger" used at school.  At Zane, Jessica K. estimates that 50-60 students

1  have called her "nigger."  By December 2012, several students called Jessica K. "nigger" every
2  single day.

3    51.    Zane students have also told Jessica K. repeatedly that she must live on "S" street,
4  because Black girls grow up to be "strippers," that she must live on "H" street, because Black girls
5  grow up to be "hookers," and that she must live on "W" street, because Black girls grow up to be
6  "whores."

7    52.    Around December 2012, students began to harass Jessica K. in other ways.  Around
8  winter break, a student in Jessica K.'s physical education class took Jessica K.'s physical education
9  uniform out of her locker and threw it into the garbage can.  Her clothing was later found in a pile
10  of dirty clothes.  Beginning in January 2013, a White student began throwing objects, such as
11  pencils and erasers, at Jessica K. during class.  The harassment became so bad that Jessica K.
12  began to eat lunch with one of her teachers to avoid being harassed by other students in the
13  cafeteria.

14    53.    During the winter and spring of 2013, the use of racial slurs continued, and physical
15  harassment against Jessica K. escalated.

16    (a)    Beginning in January 2013, a White student, hereafter referred to as "L.,"
17    encouraged other students to verbally harass Jessica K. by calling her "ugly" and saying
18    that Jessica K. would grow up to be a prostitute because she is Black.

19    (b)    In February 2013, Jessica K. and her mother, Brianna K., attended a school
20    basketball game at Zane, where they heard students make racist and derogatory remarks
21    about other students and parents throughout the game.

22    (c)    In March 2013, Jessica K. received a note in her backpack from another
23    student that said, "Shut the fuck up."  That same day, a boy pushed Jessica K. in the
24    hallway, causing her to injure her ankle.

25    (d)    Between October 2012 and April 2013, White students physically harassed
26    Jessica K. in school on a regular basis.  White students tripped Jessica K. in the hallways on
27    a daily basis.

28

(e)     Also in April 2013, L. intentionally shoved Jessica K.'s head into an open locker in the locker room.  Jessica K.'s head hit both sides of the locker at the temples, and other students laughed.

(f)     In addition, in spring 2013, Jessica K. was attacked in a school bathroom, and had mascara smeared on her face and in her eyes.

(g)     In May 2013, two White male students followed Jessica K. for the entire school day, calling her "nigger" and "motherfucker."  Jessica K. believes teachers and other students heard the harassment.

(h)     Around that time, L. saw Jessica K. laughing in the hallway with a friend and said, "Finally, the nigger is happy."

54.     From early November 2012 through May 2013, Jessica K. filed at least ten incident reports with Zane officials regarding the use of racial slurs and derogatory comments against her and the physical harassment she experienced from other students.

55.     In addition to Jessica K.'s incident reports, Brianna K. communicated almost twenty times with school staff, including Principal Schmidt, Vice Principal Goddi, Vice Principal Perry, the school counselor, and several teachers, via telephone, email, and in person, to express her concerns about the students' use of racial slurs, verbal and physical harassment of Jessica K. Brianna K. requested that the school take a number of actions, including punishing the harassing students, switching Jessica K.'s classes so she was no longer in class with those students, and creating a safety plan to protect Jessica K. from harassment.

56.     In response to Brianna K.'s requests, Defendants failed to take actions that stopped the use of racial slurs and other harassment of Jessica K.:

(a)     On several occasions, the school counselor, in the presence of Principal Schmidt, told Brianna K. that students use the word "nigger" because it is frequently used on the radio and TV.  Principal Schmidt and the school counselor indicated to Brianna K. that there was little they could do to stop its use.

(b)     On several occasions, Principal Schmidt indicated that she would talk to individual students about their use of the word "nigger" and other racial harassment of

13

Jessica K.  However, after speaking with the students, Principal Schmidt dismissed Jessica K.'s complaints, stating that because she did not know of a witness to corroborate Jessica K.'s reports, she could not punish the harassing students.  Principal Schmidt repeatedly gave more weight to the stories of White students than to Jessica K.'s reports.

(c)     Although school staff ultimately switched Jessica K.'s science class, in part to separate her from L., school staff also switched L.'s schedule so that L. remained in Jessica K.'s physical education period, during which L. continued to harass Jessica K. in the locker room.

57.     Defendants also contributed to a racially hostile environment by failing to take reasonable steps to protect Jessica K. from acts of retaliation by students in response to Brianna K. and Jessica K.'s complaints about racial harassment.

(a)     On one occasion, in January 2013, L. was punished for harassing Jessica K. by receiving one day of in-school suspension.  During L.'s in-school suspension, she used her cell phone to text message her friends to blame Jessica K. for her suspension, which led to an escalation in harassment.  During and after L.'s suspension, L.'s friends harassed Jessica K., calling her a "snitch."  Jessica K. feared for her safety because L. had previously threatened to have her friends beat up Jessica K.  Jessica K. left school, because she was afraid L.'s friends would attack her if she stayed on campus.

(b)     When L. returned to her regular classes after the in-school-suspension, she mouthed curse words at Jessica K. in the cafeteria during breakfast.

(c)     Three weeks after L.'s suspension, L. gave Jessica K. an "apology letter" she had been required to write.  As L. gave the letter to Jessica K. while in the locker room, L. said, "You better not tell anyone I got suspended."  Jessica K. felt threatened by the comment.

(d)     Concerned about the retaliation and increased harassment that Jessica K. faced from L.'s friends as a result of L.'s suspension, Brianna K. asked the school counselor whether he had discussed retaliation with L.  The counselor stated that he never talked to L. about retaliation.

14

58.     Not only has Jessica K. suffered from severe racial harassment from students, she has also been unfairly penalized by her teachers as a result of this harassment.  In or around March 2013, Jessica K.'s physical education clothing was again taken and thrown in the garbage can. Jessica K. explained to the physical education teacher that she did not want to wear the dirty clothes. Although Jessica K. participated in class in every way other than wearing the required clothing, the teacher called Brianna K. to report that Jessica K. was refusing to participate.  The teacher also lowered Jessica K.'s grade for the class.

59.     In addition, school officials unfairly targeted Jessica K. for discipline for behaviors that are not punished when engaged in by White students.

(a)     Throughout the 2012-2013 year, one of Jessica K.'s teachers gave Jessica K. detention between twelve and fourteen times for normal behaviors, such as getting pencils out of her backpack, tying her shoes, and asking a question after the teacher had asked the class for questions.

(b)     In fall 2012, another teacher repeatedly yelled at Jessica K. in class and sent her out of the classroom for normal behavior, such as saying "thank you" to another student for picking up her pencil and laughing when the rest of the class also laughed.  The same teacher has also yelled at Jessica K., saying "Focus!  Don't you have a brain?"

(c)     In September 2013, yet another teacher gave Jessica K. detention for laughing in class, even though other students were also laughing.  In addition, this teacher gave Jessica K. detention several times for failing to have her legs under her desk in class, even though Jessica K. is too tall to fit her legs under the desk.

(d)     Brianna K. communicated approximately 10 times with school staff, including Principal Schmidt, Vice Principal Goddi, Vice Principal Perry, the school counselor, and several teachers, via telephone, email, and in person, to express her concerns about the District's disparate treatment of Jessica K.

60.     As a result of the racially hostile educational environment, Jessica K. has become angry, depressed, and withdrawn, and she fears going to school.  She has also suffered

1    academically as a result of Defendants' failure to address harassment by other students and unfair

2    discipline by Jessica K.'s teachers, receiving lower grades and missing valuable classroom time.

3    **ANTHONY J.**

4         61.     From 2010 through the present, Defendants have intentionally discriminated against

5    Anthony J. by subjecting him to a racially hostile educational environment.

6         62.     During the 2010-2011 school year, when Anthony J. was in sixth grade and

7    attending Alice Birney, students repeatedly called Anthony J. "nigger," made monkey sounds at

8    him, threw food at him, hit him, and spit on him.  This harassment happened in the classroom, on

9    the playground, and on the school bus.

10        63.     At various times throughout the school year, Maya J., Anthony J.'s grandmother,

11   personally reported many of these incidents to the principal of Alice Birney, Anthony J.'s teacher,

12   two school monitors, a cafeteria worker, and the Coordinator of the District's Family Resource

13   Center.  Anthony J. also separately reported to Alice Birney staff, including the school monitors,

14   that other students were racially harassing him.

15        64.     In response to Maya J.'s complaints, Defendants took ineffective and inadequate

16   steps to address the use of racial slurs and other harassment of Anthony J.  On nearly every

17   occasion that Maya J. complained about the racial harassment of Anthony J. by specific students,

18   the principal brought the harassing students into her office to question them in front of Maya J.

19   Each time, the students denied racially harassing Anthony J.  Occasionally, Anthony J.'s teacher

20   sent students who were harassing Anthony J. out of the classroom.  Upon information and belief,

21   neither school nor District staff took any further action to investigate or to stop the harassment.

22        65.     Without any effective action by the principal and other school staff at Alice Birney,

23   the harassment continued unabated and, in fact, increased.  As the school year progressed, students

24   at Alice Birney harassed Anthony J. more often than they had during the first part of the school

25   year.

26        66.     Anthony J. became increasingly reluctant to go to school because students at Alice

27   Birney continually racially harassed him.  Instead of taking steps to eliminate the hostile

28   environment, Alice Birney staff used punitive measures against Anthony J.  On one occasion when

16

1   Maya J. met with the principal to complain about the racial harassment of Anthony J., the principal

2   invited a police officer to the meeting.  The principal informed Maya J. that the police officer was

3   there to discuss Anthony J.'s absences from school.  Maya J. told the principal and the police

4   officer that Anthony J. had missed school to avoid the students who were racially harassing him.

5   Instead of offering to investigate the harassment, the police officer threatened to go to Anthony J.'s

6   home and physically drag him out of bed to bring him to school.

7          67.     From 2011-2013, Anthony J. attended seventh and eighth grades at Zane.

8   Throughout Anthony J.'s attendance at Zane, students targeted Anthony J. because of his race

9   through verbal slurs, including the word "nigger," and physical harassment.

10             (a)     During the 2011-2012 school year, Zane students called Anthony J. various

11             slurs, including the word "nigger," on school grounds.  On at least one occasion, a White

12             student who directed slurs toward Anthony J. tripped him on the school basketball court.

13             Anthony J. fell and developed a serious infection on his leg because of a cut he sustained

14             from the fall.

15             (b)     During the 2012-2013 school year, on at least three occasions, other students

16             shouted "nigger" and "nigger baby" at Anthony J. while he was playing basketball.  A

17             White student who directed slurs toward Anthony J. also told him, "I'm going to kick your

18             ass."

19          68.     On numerous occasions, Anthony J. or his family members, including Maya J.,

20   described these incidents to Zane staff, including Principal Dennis Scott, Principal Jan Schmidt,

21   Vice Principal Martin Goddi, Vice Principal Ronald Perry, the school counselor, one of Anthony

22   J.'s teachers, and one of the school monitors.

23             (a)     At the beginning of the 2011-2012 school year, Maya J. personally told

24             Principal Scott, Vice Principal Goddi, and the school counselor that students at Zane were

25             racially harassing Anthony J.

26             (b)     During the 2011-2012 school year, Maya J. told Vice Principal Martin

27             Goddi approximately two or three times per week that other students were harassing

28

1    Anthony J.  Maya J. continued to regularly report the harassment of Anthony J. to Vice

2    Principal Goddi during the 2012-2013 school year.

3        (c)     In addition to her complaints to Vice Principal Goddi, throughout the 2011-

4    2012 and 2012-2013 school years, Maya J. complained multiple times in person to other

5    Zane staff that students at Zane were harassing Anthony J.

6        69.     Zane school staff took ineffective and inadequate steps to stop the racial harassment

7    of Anthony J.

8        (a)     Although Principal Scott, Vice Principal Goddi, and the school counselor

9    told Maya J. at the beginning of the 2011-2012 school year that they would try to monitor

10   the interactions between Anthony J. and the students who were harassing him, upon

11   information and belief, these officials failed to take any additional disciplinary steps or

12   remedial measures to stop the harassment.

13       (b)     Vice Principal Goddi also told Maya J. and Anthony J. that he would talk to

14   the students who were harassing Anthony J. to try to persuade them to stop harassing him.

15   However, upon information and belief, Vice Principal Goddi failed to take any additional

16   disciplinary action or the measures, if any, he took were ineffective to stop the harassment.

17       (c)     In early 2013, the school counselor admitted to Maya J. that the "n-bomb is

18   dropped a lot" at Zane.  Maya J. understood the counselor to be referring to the word

19   "nigger."  Upon information and belief, the school counselor failed to take any additional

20   disciplinary or remedial measures to stop the harassment.

21       (d)     In early 2013, a school monitor told a student to stop chanting "nigger" at

22   Anthony J. on the basketball court.  Nevertheless, the same student, and another student,

23   continued to chant "nigger" at Anthony J. on the basketball court.  No disciplinary action

24   was ever taken to stop the chanting.

25       70.     Because the District failed to make reasonable and effective efforts to stop the racial

26   harassment of Anthony J., the harassment intensified during the second half of the 2011-2012

27   school year, as students at Zane racially harassed Anthony J. more often.  The harassment

28   continued into and throughout the rest of the 2012-2013 school year.

71.     In addition to subjecting Anthony J. to a racially hostile environment by failing to take reasonable and effective steps to address ongoing racial harassment, Zane staff disparately disciplined Anthony J.  In mid-September 2012, when Anthony J. was in eighth grade, Maya J. and Anthony J. attended "Back To School Night" at Zane.  Maya J. toured Anthony J.'s classrooms and met his teachers while Anthony J. waited for her outside on school grounds.  As he waited for Maya J., a group of students surrounded Anthony J. and taunted him.  As these events unfolded outside, Vice Principal Goddi approached Maya J. and told her that he had just observed a group of students harassing Anthony J.  Vice Principal Goddi assured Maya J. that he had the situation "under control."  Despite these assurances, the harassment continued.  In the face of no effective action by school authorities, Anthony J. took matters into his own hands and reacted physically against one of the White students who was harassing him.  Anthony J. was then suspended for three days by Principal Jan Schmidt and referred to the Humboldt County Probation Department. Upon information and belief, no other child involved in the incident, including the White student who provoked the incident, was disciplined or referred to the Probation Department or other legal authorities.

72.     Zane staff also disparately enforced school rules against Anthony J.  For example, throughout spring 2013, Principal Schmidt prohibited Anthony J. from listening to music on his headphones on school grounds.  Upon information and belief, Principal Schmidt allowed White students to use their headphones on school grounds.  Maya J. complained to Zane school staff about the discriminatory treatment of Anthony J., but no action was taken to end the discrimination.

73.     Anthony J. continues to experience harassment since entering the ninth grade at Eureka High.

74.     As a result of the racially hostile environment at District schools, Anthony J. has grown increasingly withdrawn, depressed, and angry.  Anthony J. has also expressed suicidal ideation because of the continued racial harassment.  For example, during the 2010-2011 school year, Anthony J. told Maya J., "I should just shoot myself in the head."  During the 2012-2013 school year, Anthony J. told his aunt, "Zane is a death wish for me."  Up to the present time,

1   Anthony J. dreads going to school because of the taunts and slurs to which other students subject

2   him during the school day.  Moreover, Anthony J. has become isolated from his classmates and

3   increasingly withdrawn at home.

4   **ASHLEY W.**

5   75.   Since fall 2011, when Ashley W. began attending Zane, Defendants have

6   intentionally discriminated against Ashley W. by subjecting her to a racially hostile educational

7   environment.

8   76.   During Ashley W.'s entire tenure at Zane, she was subjected to the almost daily use

9   of racial slurs in school hallways, classrooms, and other common spaces at Zane.  During the 2011-

10  2012 and 2012-2013 school years, Ashley W. heard the word "nigger," or its shortened form,

11  "nigga," used by other students frequently, sometimes as many as twenty times per week, and often

12  directed at her.

13  77.   Ashley W. has also been taunted with other racial slurs and derogatory statements in

14  District schools.  For example:

15      (a)   In January 2013, a student called Ashley W. "nutella" and "chocolate

16      raisin," which Ashley W. believes were derogatory comments made based on her race.

17      (b)   In spring 2013, another student called Ashley W. a "gorilla" and told her to

18      "go back to Africa."

19      (c)   In September 2013, at Eureka High, a student commented to Ashley W. that

20      she must have forgotten to eat her fried chicken that day, which was a pejorative reference

21      to a racial stereotype that all Black people like fried chicken.

22  78.   Students often use these racial slurs in the presence of District staff.  Ashley W. and

23  Cleo W. have heard students use racially derogatory terms in areas where District staff can and do

24  observe the harassment, including in hallways, and on the "quad" where students congregate

25  during lunch.  For example:

26      (a)   During the 2011-2012 school year, Principal Scott was present when a White

27      male student called Ashley W. "nigger" and commented on Ashley W.'s skin color.

28

(b)     During the 2012-2013 school year, the same White student called Ashley W. "nigger" and made offensive comments about Africans at least once per month during class. Other students heard the slurs and laughed.

(c)     In April 2012, while waiting in the school office to discuss Ashley W.'s racial harassment with school administrators, Cleo W. heard two White male students say, "[t]hose fucking niggers.  I can't stand them."  A school secretary was seated close enough to Cleo W. to hear the comments.

79.     Ashley W. has also been subjected to racially derogatory language by District staff on several occasions, including:

(a)     In or around April 2012, Ashley W.'s language arts teacher, who is White, told Ashley W., "Black people get bored easily" in front of the entire class.  The same teacher repeated the comment to one of Ashley W.'s friends shortly thereafter.

(b)     In spring 2012, during a food fight in the cafeteria, a school monitor, who is White, accused Ashley W. of throwing food.  When Ashley W. said she was not involved, the monitor said to Ashley W., "Don't give me your Black attitude."

80.     District staff have also unfairly targeted Ashley W. for discipline, when White students were not similarly disciplined.

(a)     Throughout the 2011-2012 school year, Ashley W.'s language arts teacher unfairly targeted Ashley W. for discipline.  This teacher frequently sent Ashley W. and the only other Black student in the class out of the classroom for talking or laughing, but did not discipline White students for the same behaviors.

(b)     In April 2012, Ashley W. received a three-day suspension for responding physically to a White student who regularly used racial slurs.  The student had called Ashley W. "nigger" after Ashley W. accidentally brushed her hand against the student's arm.  Ashley W. complained about the slur to Vice Principal Goddi, who stated, "People can be ignorant" and that he would speak with the student.  Later that day, after receiving no effective response from the school and hearing that the student wanted to fight her,

Ashley W. ultimately got into a physical altercation with the other student.  Ashley W. was suspended, while the White student received no punishment at all.

81.   Ashley W. further experiences the racially hostile environment through the presence of racial slurs, such as "nigger," and other words used as slurs, such as "negro," in District school curricular materials.  On different occasions, when those words were used in films and books as part of the class curriculum, White students stared at Ashley W. or laughed.  Although teachers were present when this occurred, they did not discuss the offensiveness or the historical context of the terms.  On information and belief, the inclusion of these words in the curriculum and the teachers' failure to explain the meaning or the historical context of these words gave other students the impression that taunting Ashley W. with these words is acceptable.

82.   Throughout Ashley W.'s seventh and eighth grade years at Zane, Ashley W. and Cleo W. have complained directly on numerous occasions to District staff, including Principal Scott, Principal Schmidt, Vice Principal Goddi, Vice Principal Perry, the school counselor, and several teachers about the use of racial slurs in schools, the unfair discipline, and the lack of sensitivity to Black history in the curriculum.  Specifically, Ashley W. and Cleo W. complained to District staff as follows:

(a)   On several occasions, Cleo W. immediately complained to Principal Scott following incidents of verbal harassment in the classroom.

(b)   During informal monthly meetings with school staff beginning in April 2012 and continuing until the end of the 2012-2013 school year, Cleo W. and Ashley W. complained about specific incidents of harassment, such as the ongoing use of racial slurs, including the word "nigger" and derogatory comments by students and staff, and the inadequacy of the school's responses.  District staff, including Principal Scott, Principal Schmidt, Vice Principal Goddi, then-Assistant Superintendent Richard Lentz, the school counselor, teachers, and some other families and advocates attended the meetings.

83.   Defendants' inadequate responses to Ashley W.'s and Cleo W.'s complaints of harassment and discrimination demonstrate the pervasiveness of the racially hostile environment at District schools.

(a)     On at least two occasions, beginning in May 2012, the school counselor, in the presence of Principal Scott, told Cleo W. that use of the racially derogatory terms is "just the culture" at Zane, suggesting that there was little they could do to stop its use.

(b)     In June 2012, after several requests for a meeting to discuss the school monitor's comment about Ashley W.'s "Black attitude," Principal Scott held a meeting with Cleo W., Ashley W., and the monitor.  The monitor denied that she made the comment and refused to apologize.  Upon information and belief, the school did not take any further action to address the monitor's racial slur to Ashley W.

(c)     During the 2011-2012 school year, Ashley W. complained to Principal Scott about two different students who had used racial slurs towards her.  Principal Scott indicated that he would talk to the students, but made minimal efforts to discipline them, and the harassment continued.

(d)     During a meeting with school staff in December 2012, then-Assistant Superintendent Lentz denied that racial and sexual harassment was a problem at Zane, telling Cleo W. that the harassment is "only her problem."

84.     Without effective action from the District, the regular use of the word "nigger" and other taunting by students continued throughout Ashley W.'s time at Zane, and has already occurred in her first few months at Eureka High.

85.     The hostile environment has caused severe harm to Ashley W.  Defendants' failure to adequately address Ashley W.'s many complaints has caused Ashley W. to feel devalued and unsafe at school.  She has become anxious and depressed.  During eighth grade she often cried because of the unrelenting harassment.  Ashley W. also had trouble sleeping, experienced frequent headaches, and gained extra weight during both seventh and eighth grades; and the harassment was a significant contributing factor to these health problems.

86.     The ongoing harassment also negatively affected Ashley W.'s academic achievement.  Ashley W. received lower grades during seventh and eighth grades because she was so distracted by the harassment she was experiencing that it was difficult for her to focus on her schoolwork, and because she was frequently and unfairly sent out of the classroom while White

1    students who behaved in the same manner were not disciplined.  In April 2013, Ashley W. stayed

2    home from school after a day when the harassment had become so intense and severe that she felt

3    like she could not breathe, and she was so angry she felt like she would explode if she went to

4    school.  At that time, Ashley W. began to see a counselor to help her handle the stress and trauma

5    of the ongoing harassment.  Her progress reports from school after that time also showed a drop in

6    grades, which, on information and belief, is directly related to the hostile environment at school

7    that Ashley W. was enduring on a daily basis.

8    **ALEXIS R.**

9         87.    Since 2009, when Alexis R. began attending Zane, Defendants have intentionally

10   discriminated against her by subjecting her to a racially hostile educational environment.  From

11   2009 to 2011, the District discriminatorily denied Alexis R. sufficient educational resources and

12   support, and then transferred her out of District schools and into county community schools

13   because of her race.

14        88.    During the 2009-2010 school year, when Alexis R. was in the seventh grade at

15   Zane, she contracted the H1N1 "swine flu" virus.  As a result of her long absence from school

16   while she recuperated, Alexis R. fell behind in her classes.  Zane school staff told Alexis R. and her

17   mother, Anna R., that Alexis R. could make up her school assignments when she returned to

18   school.  Rather than assist Alexis R. to make up her missed school work upon her return to school,

19   however, Zane school staff simply gave Alexis R. all of the school work that she had missed and

20   expected her to make it up very quickly.  Alexis R. did not receive adequate assistance or

21   explanation from her teachers about the school work she had missed.  As a result, Alexis R. fell

22   behind in her academic credits.

23        89.    Although Alexis R. completed summer school in summer 2010, between seventh

24   and eighth grades, she was still behind in her credits.  Zane staff did not help Alexis R. recover

25   needed credits at Zane by offering tutoring or after-school assistance.  Instead, in 2011, Zane

26   officials told Alexis R. and Anna R. that Alexis R. must transfer to ERC, a county community

27   school, for "credit recovery."  The California statutes governing county community schools make

28   clear that such schools are intended for "high-risk" students, such as those students who have been

1  expelled, referred through the county probation department, or referred by the school attendance

2  review board.  Alexis R. fit none of these categories, and ERC was not an appropriate educational

3  setting for Alexis R.

4       90.    Alexis R.'s inappropriate transfer to ERC represents a pattern in which the District

5  inappropriately pushes Native American students into county community schools for "credit

6  recovery."  ERC does not provide all of the courses necessary to qualify for entry into California

7  State Universities and schools in the University of California system, and it has fewer hours of

8  instruction, and little, if any, extracurricular activities.  The District's deliberate indifference to

9  providing equal educational opportunity to Native American students is reflected in its practice of

10  transferring Native American students, such as Alexis R., to these schools for inappropriate

11  reasons.  Upon information and belief, during the 2011-2012 school year, most of the White

12  students who were referred to ERC by the District were referred because of their involvement with

13  the juvenile justice system, rather than being referred to ERC for "credit recovery."

14       91.    Moreover, the District took no initiative to reenroll Alexis R. in District schools.

15  Instead, the District placed the burden on Anna R. to arrange a meeting with District staff to

16  reenroll Alexis R.  The District then required Alexis R. to sign a "Committee for Alternative

17  Placement Report of Action" ("CAP contract") before allowing her to enroll in Eureka High.  The

18  CAP contract mandated that Alexis R. meet stringent attendance, behavioral, and academic

19  requirements during the entire school year.  It stated that, if she did not meet those requirements,

20  the District could legally exclude her from District schools.  Alexis R. had no history of behavioral

21  problems in the District schools.  In fact, Alexis R. received academic achievement awards while

22  she was a student at Zane.

23       92.    The District also fosters an educational environment that is hostile to Native

24  American students in other ways.  In spring 2013, Alexis R.'s history teacher at Eureka High

25  inappropriately singled out Alexis R. to discuss a sensitive event in Native American history.  The

26  history teacher asked students in her class to raise their hands if they were Native American.

27  Several students in the class raised their hands.  The teacher then asked who was a member of a

28  local Native American tribe.  When Alexis R., a member of the local Yurok tribe, raised her hand,

1   the teacher quizzed Alexis R. about a nineteenth century massacre of another local tribe, the Wiyot

2   tribe.  Alexis R. was upset because the teacher inaccurately explained the massacre to students.

3   Alexis R. was also upset that her teacher targeted her to discuss the genocide of Wiyot tribe

4   members, both because it is a sensitive topic and because Alexis R. is a member of a different tribe.

5        93.    District staff have also treated Native American students and their parents in a

6   racially hostile manner by disparately enforcing school rules against Native American students, and

7   disregarding or actively obstructing complaints from Native American students and parents about

8   this disparate treatment by school staff.

9        94.    In December 2012, over a period of three days, a substitute teacher at Eureka High

10  targeted Alexis R., the only Native American student in the class, for unfair discipline by, among

11  other things, unreasonably denying Alexis R.'s reasonable requests to use the bathroom; and

12  sending Alexis R. and her friend out of the classroom for talking, even though many White

13  students in the classroom were talking, but were allowed to remain in class.  On each of the three

14  days that the substitute teacher targeted her for harassment, Alexis R. filed a written complaint with

15  then-Eureka High Vice Principal Ronald Perry about the substitute teacher's behavior.

16       95.    Vice Principal Goddi replaced Vice Principal Perry at Eureka High in January 2013.

17  During that month, Anna R. spoke to Vice Principal Goddi several times to determine how the

18  District planned to resolve her daughter's complaints about the substitute teacher.  In mid-January,

19  the school secretary told Anna R., in the presence of Vice Principal Goddi, that all of Alexis R.'s

20  written complaints had been thrown into the garbage.

21       96.    Anna R. also reported to then-Assistant Superintendent Lentz, Principal Jordan,

22  Director of Student Welfare Alexander, and the then-principal of Washington Elementary School

23  that Eureka High staff threw Alexis R.'s written complaints of harassment away.  Principal Jordan

24  discouraged Anna R. from filing a written complaint, telling Anna R. that he would not investigate

25  if she filed a written complaint about the lost complaints, but that he would investigate if she did

26  not file anything in writing.  Director of Student Welfare Alexander told Anna R. that she would

27  recommend to Principal Jordan that he not respond to Anna R.'s complaints in writing.

28

97.     Although then-Assistant Superintendent Lentz was the representative designated by the District to receive complaints under the Uniform Complaint Procedure ("UCP"), he never told Anna R. that the UCP process even exists.  Then-Assistant Superintendent Lentz suggested that Anna R. file a *Williams* complaint form with the District, even though the *Williams* form was the wrong form because it addresses complaints regarding facilities, textbooks, and other specific educational resources.

98.     Defendants also create a racially hostile environment in District schools by failing to support Native American students' involvement in community and cultural activities that are of critical importance to the preservation and validation of Native American tribes and individuals' cultural identities.  The District routinely refuses to excuse Alexis R.'s absences to participate in vitally important Yurok cultural activities, including community brush dances, funerals, and salmon fishing.  On at least three occasions during the 2012-2013 and 2013-2014 years, Eureka High staff issued truancy notices to Alexis R. when she attended Native American cultural activities.  These included at least two occasions in which Eureka High staff told Alexis R. and Anna R. that Alexis R.'s absences from school would be excused but then refused to excuse them after the absences had occurred.

(a)     Between September and November 2013, Alexis R. missed several days of school to attend Native American community and cultural events, including an annual Elders' Dinner celebrating elders in the Yurok tribe, and two family funerals.  Alexis R. received truancy notices for all of these absences.

(b)     In fall 2012, Alexis R. missed school for two days to participate in a statewide conference as part of her role as a Youth Ambassador for the Yurok tribe.  Yurok Youth Advocate Rebecca Melvin and Anna R. both notified the Eureka High staff that Alexis R. would be absent to attend the conference, and they were led to believe by Eureka High staff that the absences would be excused.  Later, a Eureka High school counselor told Alexis R. and Anna R. the absences were not excused.

(c)     During the 2012-2013 school year, Alexis R. and Anna R. were told that Eureka High would excuse Alexis R.'s absences to participate in a peer counseling program

through the United Indian Health Services Teen Advisory Group, and to give a presentation in Sacramento through the California Rural Indian Health Board.  However, the Eureka High staff did not excuse these absences.

(d)     Because District staff have refused to excuse Alexis R. from school for salmon fishing, Alexis R. has been forced to choose between receiving unexcused absences and participating in this vital activity.  Alexis R.'s participation in annual salmon fishing is extremely important both for Alexis R.'s family's well-being, her cultural identity, and the cultural identity of the Yurok tribe.  The Yurok tribe has fought vigorously for their right to fish in the Klamath River, and members of the tribe are only allowed to do so during a short period of time during the year.  Alexis R. fishes in the Klamath River both because it is a central activity of the Yurok tribe, and to provide needed food for her family for the coming year.  Alexis R.'s decision to attend these events, despite the District's refusal to excuse her absences, has contributed to her being classified as a "habitual truant" and has put her in danger of being involuntarily transferred back to ERC.

99.     Anna R. has complained to District staff about their failure to excuse Alexis R.'s absences for vital cultural activities.  Then-Assistant Superintendent Lentz told Anna R. that absences for cultural activities are not excused, and if she wants to change that policy, she will have to speak with the Governor of California.

100.     The consistently racially hostile environment to which Alexis R. has been subjected has caused her extreme stress, anxiety, and depression.  Because of the hostile environment she experiences and the lack of support she has received at Eureka High, Alexis R. is considering transferring to an independent study program at Zoe Barnum Continuation School.  The stringent attendance and disciplinary standards to which Alexis R. has been subjected under the CAP contract make the inconsistent and conflicting information about her excused absences particularly stressful for Alexis R.

101.     It is upsetting to Alexis R. and Anna R. that District staff wrongfully implied in the CAP contract that Alexis R. had previous behavioral problems that contributed to her transfer to ERC, even though Alexis R. has never had serious behavioral issues at school.  Furthermore, it is

28

1   very distressing to Alexis R. and Anna R. that, in order to reenroll in a District comprehensive
2   school, Alexis R. was forced to agree to the CAP contract, which allows the District to forcibly
3   transfer Alexis R. out of the District for reasons that would not otherwise be lawful.  On
4   information and belief, the District has targeted Alexis R. with heightened requirements for
5   attending District schools because she is Native American.

6   102.   Alexis R. often experiences nausea and headaches that can last as long as three
7   hours because she is so anxious about her academic progress at Eureka High.  After being targeted
8   for enforcement of school rules and consistently disparate treatment, Alexis R. is constantly
9   worried that she will be disciplined for something she did not do and that her educational
10  achievement will be further derailed.

11  **SEX DISCRIMINATION**

12  103.   Defendants have also intentionally discriminated against Jessica K. and Ashley W.
13  by subjecting them to a sexually hostile educational environment.  Jessica K. and Ashley W. each
14  suffered emotional, academic, and psychological harms due to severe and pervasive discrimination
15  and harassment based upon their gender and the perpetuation of a sexually hostile environment that
16  denies female students access to equal educational opportunities.

17  104.   From the time Jessica K. began attending District schools, and continuing to the
18  present she has been continually subjected to a hostile educational environment on the basis of
19  gender, including unwelcome verbal provocations and physical conduct of a sexual nature.  Since
20  2010, and continuing to the present, Ashley W. has been continually subjected to a hostile
21  educational environment on the basis of gender, including unwelcome verbal provocations.  From
22  2011 to the spring of 2013, Ashley W. was also subjected to physical sexual harassment.  The
23  harassment occurred and continues to occur during school hours and on school grounds.
24  Defendants were repeatedly made aware of, and in some instances, witnessed, the sexually hostile
25  educational environment Plaintiffs faced.  Defendants' responses to this hostile educational
26  environment were clearly inadequate and unreasonable in light of the known circumstances,
27  because the harassment has continued.

28

**JESSICA K.**

105.    Defendants have intentionally discriminated against Jessica K. by subjecting her to a sexually hostile educational environment on the basis of her gender, including but not limited to the following examples.

106.    During the 2012-2013 school year, while Jessica K. was in the seventh grade at Zane, she was hit on her buttocks as part of "Slap Ass Friday" on at least two occasions.

107.    Jessica K. has been punched in the chest on multiple occasions in the girls' locker room as part of "Titty Twisting Tuesdays."  Jessica K. wears t-shirts underneath her P.E. shirts and hides in bathroom stalls when she has to change for P.E. so she can avoid being assaulted in this fashion.

108.    During the 2012-2013 school year, in science class, a Zane science teacher sexually harassed Jessica K.

(a)    In the fall of 2012, Jessica K. narrowly avoided walking into a structural support pole in her science classroom, and she asked her science teacher what purpose the poles served.  The teacher told her that the poles were "for pole-dancing."  He then began to mimic pole-dancing on the structural support while looking directly at Jessica K.  Jessica K. was very upset because she is aware that "pole-dancing" is a well-known form of sexual strip tease dance that occurs in strip clubs.  The teacher laughed when Jessica K. became visibly upset.

(b)    Jessica K.'s mother, Brianna K., emailed Principal Schmidt to complain about the science teacher's sexually explicit behavior.  Principal Schmidt did not respond to Brianna K.'s email and, during a meeting with the science teacher and Vice Principal Goddi, the teacher defended his comment and actions by saying that he was referring to the exercise fad of pole-dancing.  With Brianna K. and the teacher present, Vice Principal Goddi acknowledged that the teacher's actions were "unbelievable" but, upon information and belief, Defendants did not discipline the teacher for his behavior, did not investigate further, and took no immediate action to remove Jessica K. from this teacher's science class.

(c)     In addition to making sexually explicit comments to Jessica K. himself, the same science teacher failed to stop other students from sexually harassing her.  For example, in the fall of 2012, a student told Jessica K. to, "Calm your tits."  Another student replied, "That'd be easy if she had some."  Other students began to laugh.  The science teacher was present for this behavior, but did not intervene, discipline the harassing students, or address the students who were laughing.  Jessica K.'s mother complained to Principal Schmidt about this incident during an in person meeting.  Principal Schmidt acknowledged that the incident was "horrible," but took no action to address it or prevent incidents like this from happening in the future.  Upon information and belief, Defendants did not investigate further, discipline the harassing students, or address Jessica K.'s concerns in any manner.

109.    From 2012 to the present, several students have directed sexually derogatory remarks at Plaintiff Jessica K. on a regular basis in classrooms, hallways and at lunch.  Students have repeatedly said that Jessica K. is a "stripper" and a "whore."  On multiple occasions, students have told Jessica K. that she must live on "S" street because Black girls grow up to be strippers, that she must live on "H" street because Black girls grow up to be "hookers," and that she must live on "W" street because Black girls grow up to be "whores."  Students have also repeatedly told Jessica K. that she cannot be a successful basketball player when she grows up because Black females become "strippers," not athletes.  When Jessica K. told students to stop verbally harassing a female friend, students responded by calling Jessica K. a "slut."

110.    As a result of the sexually hostile educational environment, Jessica K. has become angry, depressed and withdrawn, feels unsafe at school, and constantly worries about being physically and verbally attacked.  Jessica K.'s grades have dropped because she was and is unable to focus in class.  Continued exposure to a sexually hostile environment has caused Jessica K. to become distrustful of adults' ability to intervene to end known harassment.

**ASHLEY W.**

111.    Defendants have intentionally discriminated against Ashley W. by subjecting her to a sexually hostile educational environment on the basis of her gender, including but not limited to the following examples.

112.    Since at least 2011-2012, Ashley W. witnessed male students targeting female students on a weekly basis on "Slap Ass Fridays." Ashley W. estimates that she was slapped in the buttocks approximately 100 times in the seventh grade, and approximately ten times in the eighth grade. Another student also told Ashley W. that her buttocks are so big that slapping them is unavoidable.

113.    During the 2011-2012 and 2012-2013 school years, Ashley W. and her mother complained repeatedly to Zane staff and administrators about Slap Ass Fridays and Titty Twisting Tuesdays, repeatedly describing to Zane administrators the specific ways that students had sexually harassed Ashley W. Defendants did not take specific remedial actions to address Ashley W.'s complaints. As a result, students continued to slap each other's buttocks on Slap Ass Fridays and twist or punch each other's breasts on Titty Twisting Tuesdays.

114.    Throughout her attendance at Zane and Eureka High, Ashley W. has been repeatedly called a "ho" by other students. Ashley W. understands that "ho" is a synonym for a prostitute, and she has repeatedly asked students to stop calling her a "ho." Despite these repeated requests, students have continued to call her this name. Throughout her attendance at Eureka High, Ashley W. has also heard male students repeatedly call female students "bitch," including at least one time when a male student called Ashley W. a "bitch" during physical education class. Defendants have failed to take effective action to end the behavior.

115.    This consistently sexually hostile environment has caused serious harm to Ashley W. Ashley W. feels devalued and unsafe from sexual harassment when she is at school, and her grades have suffered as a result of the unremitting harassment she has endured. Defendants' failure to adequately address Ashley W.'s many complaints about ongoing sexual harassment has caused Ashley W. to become anxious and depressed. As a result of this harassment, Ashley W. began attending counseling, but she feels it does not help.

**DISABILITY DISCRIMINATION**

**JESSICA K.**

116.    Plaintiff Jessica K. has a visual and perceptual processing disorder that significantly and adversely affects her within the educational environment.  Jessica K. particularly struggles with math and science, because her limited visual memory makes it difficult to remember and manipulate material from multiple sources, such as the blackboard, her book, worksheets, and notes.

117.    In August 2012, Jessica K. enrolled in Zane.  Upon information and belief, Jessica K.'s cumulative education record at Zane contains a copy of a December 2011 evaluation describing Jessica K.'s visual and perceptual processing deficits.  A week prior to enrolling Jessica K. in Zane, Brianna K., Jessica K.'s mother, informed Principal Schmidt that Jessica K. has a visual processing disorder.

118.    During the 2012-2013 school year, Brianna K. requested a number of accommodations from Zane school staff to address Jessica K.'s visual and perceptual processing deficits.  Among other accommodations, Brianna K. requested that Zane school staff seat Jessica K. at the front of the classroom; provide Jessica K. with extended time and a quiet space to take tests; and provide Brianna K. information about class curricula so she could prepare Jessica K. for class.  With each request, Brianna K. explained that Jessica K. had a visual processing disorder, and told them that the evaluation was contained in Jessica K.'s school record.

119.    During the 2012-2013 school year, Zane school staff did not provide Jessica K. with the accommodations Brianna K. requested.  Zane staff did not provide Brianna K. with any information about Jessica K.'s rights as a student with a disability, or any information about their potential obligations to her.  Jessica K. struggled in math and science.

120.    In September 2013, Brianna K. requested accommodations for Jessica K.'s visual and perceptual processing deficits from Jessica K.'s math teacher at Back-to-School Night.

121.    In October 2013, Brianna K. made a written request to Principal Schmidt for accommodations and modifications due to Jessica K.'s visual and perceptual processing deficits.

122.     After Brianna K.'s request, in October 2013, the school counselor informed Brianna K. that the school would not convene a team meeting to discuss accommodations under Section 504 unless Brianna K. obtained an updated private evaluation for Jessica K.  When Brianna K. told the counselor that the private evaluation would cost three hundred fifty dollars ($350), he asked if her insurance would pay for the evaluation.  The counselor did not offer to provide an evaluation of Jessica K.'s visual and perceptual processing deficits at the District's expense.

123.     Brianna K. requested that Zane staff meet to discuss what accommodations Jessica K. could receive pending the updated evaluation.  In November 2013, Zane staff met with Brianna K. and Principal Schmidt reiterated that Zane would not provide accommodations until Brianna K. provided a new evaluation at her own expense.  Principal Schmidt dismissed Brianna K.'s concern that, in addition to the monetary cost of an updated private evaluation, Brianna K. would have to take time off from her job to drive Jessica K. to the evaluator.

124.     In December 2013, the District told Brianna K. that they wanted the school psychologist, Valerie Franklin, to evaluate Jessica K.  Valerie Franklin was unfamiliar with the tests needed to evaluate Jessica K., searched for them on the internet in front of Brianna K., and stated she would pull a few tests from different places to evaluate her.  Valerie Franklin did not have a specific protocol for testing visual processing disorder.

**ALEXIS R.**

125.     Alexis R. has asthma and chronic bronchitis.  While in District schools, Alexis R. has accumulated absences and has been late to class because of her respiratory problems.

126.     Alexis R. also has significant difficulties with attention and reading comprehension. Alexis R. has experienced trouble maintaining attention, both at school and at home, since she was in fifth grade.  Many small things distract her, and she has a hard time sitting down and focusing on one thing.  Her paternal family also has a significant history of attention deficit hyperactivity disorder ("ADHD").

127.     Alexis R. has struggled academically while in District schools, and has received low grades in many core academic subjects.

128.     Upon information and belief, Zane staff had knowledge that Alexis R. might have a disability interfering with her access to education, due to her chronic asthma; her history of difficulty with attention and reading; and her academic struggles.

129.     During the 2010-2011 school year, Alexis R. was transferred from Zane to ERC, a county community school.  Before transferring Alexis R. to ERC, Zane staff did not inquire whether Alexis R. might have a disability that impacted her access to education and that required accommodations and modifications.  Zane staff did not provide Anna R., Alexis R.'s mother, with any information about Alexis R.'s rights as a student with a disability, nor any information about the District's potential obligations to her.  At ERC, Alexis R. did not have access to the regular District curriculum and received fewer hours of educational instruction than students at District schools.

130.     Alexis R. was allowed to enroll in Eureka High for tenth grade at the start of the 2012-2013 school year.  However, the District conditioned her return to Eureka High on a CAP contract that required her to meet certain attendance, behavior, and academic performance standards and told her that she would be returned to ERC if she violated those standards.  The District made no accommodations for disability-related absences or academic struggles in Alexis R.'s CAP contract.

131.     After Alexis R. enrolled in Eureka High, Anna R. asked Eureka High staff if Alexis R. could receive accommodations for her chronic asthma.  Eureka High staff refused to provide accommodations to Alexis R., such as providing her with more time to travel between classes, and did not provide Anna R. with any information about Alexis R.'s rights as a student with a disability, nor any information about the District's potential obligations to her.

132.     In November 2013, Anna R. made a written request to Principal Jordan for accommodations and modifications due to Alexis R.'s attention and reading difficulties.

133.     After Anna R.'s request, in November 2013, Eureka High staff informed Anna R. that the school would not discuss evaluations until Anna R. produced a note from Alexis R.'s private doctor requesting evaluations.

**FIRST CLAIM FOR RELIEF**

**Violation of the Fourteenth Amendment to the United States Constitution**
**(Equal Protection Against Discrimination on the Basis of Race or National Origin)**
**42 U.S.C. § 1983**
**(All Plaintiffs Against All Defendants Except Defendant District)**

134.    Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through 44 and 49 through 102 above, as if fully set forth herein.

135.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, which is actionable under 42 U.S.C. section 1983, prohibits state actors from depriving individuals of their constitutional rights, privileges, and immunities based on race or national origin.

136.    As agents of the District, Defendants have acted and are acting under color of state law.

137.    Defendants have violated, and continue to violate, Plaintiffs' rights under the Equal Protection Clause by intentionally discriminating against them through the creation of a racially hostile educational environment, including by subjecting Plaintiffs to objectively offensive racial harassment; discriminatorily excluding Plaintiffs from District schools and implementing culturally offensive or denigrating educational curricula; and responding with deliberate indifference, through ineffective and inadequate efforts, to stop known acts of severe, pervasive, and objectively offensive racial harassment against Plaintiffs by students and District employees on school grounds.

138.    Because of the Defendants' actions and omissions, Plaintiffs have suffered and continue to suffer damage.  Due to the Defendants' refusal to admit wrongdoing, Plaintiffs reasonably fear future statutory violations.

**SECOND CLAIM FOR RELIEF**

**Violation of Title VI**
**(42 U.S.C. § 2000d _et seq._)**
**(All Plaintiffs Against Defendant District)**

139.    Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through 44 and 49 through 102 above, as if fully set forth herein.

140.    Title VI of the Civil Rights Act of 1964, 42 U.S.C. section 2000d, provides a private right of action for individuals to sue federally funded institutions for intentional discrimination based on race, color or national origin.

141.    Defendant District receives federal funding for operation of its schools.

142.    Defendant District has violated, and continues to violate, Plaintiffs' rights under Title VI by intentionally discriminating against them through the creation of a racially hostile educational environment, including by: subjecting Plaintiffs to objectively offensive racial harassment; discriminatorily excluding Plaintiffs from District schools and implementing culturally offensive or denigrating educational curricula; and responding with deliberate indifference, through ineffective and inadequate efforts, to stop known acts of severe, pervasive, and objectively offensive racial harassment against Plaintiffs by students and District employees on school grounds.

143.    Because of the Defendant District's actions and omissions, Plaintiffs have suffered and continue to suffer damage.  Due to the Defendant District's refusal to admit wrongdoing, Plaintiffs reasonably fear future statutory violations.

### THIRD CLAIM FOR RELIEF

**Violation of the Fourteenth Amendment to the United States Constitution**
**(Equal Protection Against Discrimination on the Basis of Sex)**
**42 U.S.C. § 1983**
**(Jessica K. and Ashley W. Against All Defendants Except Defendant District)**

144.    Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through 39, 45 through 47, and 103 through 115 above, as if fully set forth herein.

145.    Defendants have violated, and continue to violate, Plaintiffs' right not to be deprived of equal protection under the laws, pursuant to the Fourteenth Amendment to the United States Constitution, by intentionally discriminating against them through the creation of a sexually hostile educational environment because of their gender, including by: responding with deliberate indifference, through ineffective and inadequate efforts, to stop known acts of severe, pervasive, and objectively offensive sexual harassment against Plaintiffs by students and District employees on school grounds, thus depriving Plaintiffs of equal access to an educational opportunity or

37

1  benefit.  Harassing teachers and students were under Defendants' disciplinary authority, and the

2  sexual harassment occurred on school grounds.  Defendants had actual notice of the sexually

3  harassing conduct because Defendants personally observed the conduct, and because Plaintiffs and

4  their parents repeatedly complained of inappropriate touching and sexual comments by teachers

5  and students over the course of the 2012-2013 school year.  Defendants' failure to discipline

6  harassing students and teachers, minimal efforts to mitigate harassment, and ineffective and

7  inadequate efforts to redress the sexual harassment were clearly unreasonable in light of the known

8  circumstances.

9      146.    Because of the Defendants' actions and omissions, Plaintiffs have suffered and

10 continue to suffer damage.  Due to the Defendants' refusal to admit wrongdoing, Plaintiffs

11 reasonably fear future statutory violations.

12                          **FOURTH CLAIM FOR RELIEF**

13              **Violation of Title IX of the Education Amendments of 1972**
               **(Jessica K. and Ashley W. Against Defendant District)**
14

15     147.    Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through 39,

16 45 through 47, and 103 through 115 above, as if fully set forth herein.

17     148.    Defendant District's above-described conduct violated Plaintiffs' right to be free

18 from sexual harassment by and/or within any educational program or activity which receives

19 federal financial assistance, pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C.

20 section 1681(a), by subjecting Plaintiffs to a sexually hostile school environment because of their

21 gender.  Defendant District intentionally discriminated against Plaintiffs by exhibiting deliberate

22 indifference to sexual harassment perpetrated against Jessica K. and Ashley W. that was so severe,

23 pervasive, and objectively offensive that it effectively barred Plaintiffs' access to an educational

24 opportunity or benefit.  Harassing teachers and students were under Defendant District's

25 disciplinary authority, and the sexually harassing conduct occurred on school grounds.  Defendant

26 District had actual notice of sexual harassment because its agents personally observed the conduct,

27 and because Plaintiffs and their parents repeatedly complained of inappropriate touching and

28 sexual comments by teachers and students over the course of the 2012-2013 school year.

1  Defendant District's failure to discipline harassing students and teachers, minimal efforts to

2  mitigate harassment, and ineffective and inadequate efforts to redress sexual harassment were

3  clearly unreasonable in light of the known circumstances.

4      149.   Because of Defendant District's actions and omissions, Plaintiffs have suffered and

5  continue to suffer damage.  Due to Defendant District's refusal to admit wrongdoing, Plaintiffs

6  reasonably fear future statutory violations.

7                      **FIFTH CLAIM FOR RELIEF**

8  **Violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*., and
   Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq*.**
9  **(Jessica K. and Alexis R. Against Defendant District)**

10     150.   Jessica K. and Alexis R. incorporate by reference the allegations of paragraphs 1

11 through 39, 48, and 116 through 133 above, as if fully set forth herein.

12     151.   Jessica K.'s visual and perceptual processing disorder substantially limits the major

13 life activity of learning.  Alexis R.'s chronic asthma substantially limits the major life activity of

14 breathing.  Alexis R. also manifests the symptoms of an attention disorder that substantially limits

15 the major life activity of learning.

16     152.   The District is a public entity within the meaning of Title II of the Americans with

17 Disabilities Act ("ADA").  The District is a public school recipient within the meaning of Section

18 504 of the Rehabilitation Act of 1973 ("Section 504").  The District provides educational services

19 and activities, which are programs, services or activities within the meaning of Title II of the ADA

20 and Section 504.

21     153.   The District violated the rights of Jessica K. and Alexis R. secured by Title II of the

22 ADA and Section 504 and their implementing regulations.

23     154.   Among other things, the District intentionally did not provide Jessica K. and Alexis

24 R. with equal access to education.  The District did not identify Jessica K. and Alexis R. as

25 "qualified handicapped" individuals, despite the District's knowledge of factors suggesting that

26 each student had a disability that would qualify her for protections under Section 504 and the

27 ADA; poor academic performance in areas related to those disabilities; and parental requests for

28

1   accommodations for each child.  The District also failed to notify Jessica K., Alexis R., and their

2   parents of the District's responsibilities under Section 504.

3           155.    Because the District intentionally did not locate and identify Jessica K. and Alexis

4   R., it also failed to provide them with access to education by failing to make reasonable

5   modifications and accommodations to its policies, practices, and procedures to avoid

6   discriminating against Jessica K. and Alexis R. on the basis of their disabilities.

7           156.    In failing to comply with its obligations under the ADA and Section 504, the

8   District denied Jessica K. and Alexis R. the benefits of the District's educational programs,

9   services, and activities due to their disabilities.  In addition, the District denied Jessica K. and

10  Alexis R. the opportunity to equally, effectively and meaningfully participate in and benefit from

11  Defendants' educational programs, services, and activities due to their disabilities.

12          157.    Furthermore, the District has adopted and implemented policies and practices that

13  resulted in Alexis R.'s transfer to ERC, a county community school, without any inquiry into

14  whether she had a disability and whether she required disability-related accommodations and

15  modifications.  Through these policies and practices, the District imposed and applied eligibility

16  criteria that screened out Alexis R. from fully and equally enjoying all of the District's educational

17  programs, services, or activities.  Through these policies and practices, the District also used

18  methods of administration that had the effect of subjecting Alexis R. to discrimination on the basis

19  of disability and that defeated or substantially impaired accomplishments of the objectives of the

20  District's educational programs, services, and activities with respect to Alexis R.

21          158.    The District otherwise subjected Jessica K. and Alexis R. to discrimination on the

22  basis of their disabilities.

23          159.    Because of Defendant District's actions and omissions, Plaintiffs have suffered

24  damage.  Because Defendant District has not admitted wrongdoing, Plaintiffs reasonably fear

25  future statutory violations.

26

27

28

**SIXTH CLAIM FOR RELIEF**

**Violation of the Unruh Civil Rights Act**
**(Cal. Civ. Code §§ 51, 51.5, 52)**
**(All Plaintiffs Against Defendants Laurie Alexander, Rick Jordan, Jan Schmidt, Dennis
Scott, Martin Goddi, and Ronald Perry in their individual capacities for the purposes of
general and special damages, actual damages, and statutory damages, and in their official
capacities for the purposes of prospective relief.)**

160.    Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through 133 above, as if fully set forth herein.

161.    The Unruh Civil Rights Act ("Unruh Act") guarantees that all persons are entitled to full and equal accommodations, advantages, facilities, privileges, or services in all business establishments within California.

162.    The Unruh Act states that no business establishment shall discriminate against any person based on sex, race, color, national origin, disability, medical condition, or sexual orientation.  A public school district is a "business establishment" obliged to comply with the Unruh Act.

163.    As alleged above, Defendants Laurie Alexander, Rick Jordan, Jan Schmidt, Dennis Scott, Martin Goddi, and Ronald Perry, in their individual and official capacities, had actual notice of the racially and sexually hostile environment, had the authority to stop the discrimination, and their refusal to take reasonable action to end it was unreasonable given the circumstances.

164.    By allowing the racially and sexually hostile environment in District schools, the actions and omissions of these Defendants denied the Plaintiffs full and equal advantages, facilities, privileges, and services in a business establishment, because of race and sex in violation of the Unruh Act.

165.    The actions and omissions of these Defendants regarding Jessica K. and Alexis R. violate the ADA and, thus, also violate the Unruh Act.

166.    Because of the actions and omissions of these Defendants, Plaintiffs have suffered damage.  Moreover, the wrongful conduct of these Defendants continues to deny Plaintiffs full and equal advantages, facilities, privileges, and services at District schools on the basis of sex, race,

1  and/or disability.  Due to the refusal of these Defendants to admit wrongdoing and take remedial

2  steps, Plaintiffs reasonably fear future statutory violations.

3       167.    Because of the violations of the Unruh Act by these Defendants, they, and each of

4  them, are liable for "each and every offense for the actual damages . . . up to a maximum of three

5  times the amount of actual damage but in no case less than four thousand dollars ($4,000), and any

6  attorney's fees . . . suffered by any person denied the rights provided in the Unruh Act."

7       168.    The individual Defendants committed a separate violation of the Unruh Act each

8  day that the Plaintiffs were denied equal advantages, privileges, and services at school and each

9  day the school failed to respond to complaints of racial or sexual harassment.  Defendants

10 intentionally discriminated against the Plaintiffs on the basis of race and sex in violation of the

11 Unruh Act.

12      169.    These Defendants committed a separate violation of the Unruh Act each day that

13 Defendants violated the ADA and Section 504 for Jessica K. and Alexis R.

14      170.    Plaintiffs seek relief under Civil Code section 52, including general and special

15 damages, actual damages, and statutory damages against Defendants in their individual capacities

16 for each violation of the Unruh Act.  Plaintiffs also seek declaratory relief and injunctive relief

17 against Defendants in their official capacities, and any other relief available pursuant to Civil Code

18 section 52.

19      171.    Plaintiffs also seek all reasonable attorneys' fees and costs incurred pursuant to

20 Civil Code section 52(a).

21                          **SEVENTH CLAIM FOR RELIEF**

22              **Violation of California Government Code § 11135**
                          **Cal. Code Regs. tit. 22 § 98101**
23                          **Injunctive Relief**
                **(All Plaintiffs Against Defendant District)**
24

25      172.    Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through

26 133 above, as if fully set forth herein.

27      173.    California Government Code section 11135 prohibits discrimination against persons

28 on the basis of race, sex or disability and other protected statuses in state-run or state-funded

1 programs and activities.

2 174.   California Government Code section 11139.5 authorizes the Secretary of the Health

3 and Welfare Agency to promulgate regulations that establish "standards for determining what

4 practices are discriminatory."  Cal. Gov't Code § 11139.5.  The regulations promulgated by the

5 Secretary of the Health and Welfare Agency provide, in relevant part, that "[i]t is a discriminatory

6 practice for a recipient. . . . (i) to utilize criteria or methods of administration that . . . (1) have the

7 purpose or effect of subjecting a person to discrimination on the basis of ethnic group

8 identification, religion, age, sex, color, or a physical or mental disability[.]"  Cal. Code Regs.

9 tit. 22, § 98101(i)(1).

10 175.   The District's operation of elementary schools, middle schools, and high schools

11 within the District and its administration of educational services within those schools are subject to

12 California Government Code section 11135(a) because they constitute a program or activity which

13 is funded directly by the state of California or receive financial assistance from the state.

14 176.   California Government Code section 11139 provides that the antidiscrimination

15 provisions of California Government Code section 11135 *et seq.*, and the regulations adopted

16 pursuant thereto "may be enforced by a civil action for equitable relief, which shall be independent

17 of any other rights and remedies."  Plaintiffs therefore have the right to bring a civil action for

18 injunctive relief to enforce the rights guaranteed to them under California Government Code

19 section 11135 and the regulations promulgated by the Secretary of the Health and Welfare Agency.

20 177.   The District's application of policies in its administration of educational services

21 within District schools has had and continues to have the effect of denying Plaintiffs full and equal

22 access to the benefits of the programs or activities administered by the District, or of subjecting

23 Plaintiffs to discrimination under such programs or activities, on the basis of their race.  The

24 following policies are illustrative of the disproportionate impact of the application of these policies

25 on Black and Native American students within the District.

26 (a)   The District has disproportionately and unfairly disciplined Black and

27 Native American students, resulting in suspension rates for Black and Native American

28 students that are significantly higher than their rate of enrollment in District schools.  In

43

1   contrast, White students were suspended at rates at or about their rate of enrollment at the

2   same District schools.

3          (b)     The District has systematically failed to enforce discipline in an evenhanded

4   fashion, resulting in Black students being routinely disciplined for conduct for which White

5   students are not disciplined.

6          (c)     The District pushes Native American students out of District schools and

7   into county community schools and other alternative schools at rates much higher than

8   similarly situated White students.

9          178.    As a result of the manner in which the District has administered the policies

10  described in Paragraph 177 above, Plaintiffs have been denied full and equal access to the benefits

11  of educational opportunities within District schools, or have been subjected to discrimination under

12  such programs or activities, on the basis of race, in violation of California Government Code

13  section 11135(a) and California Code of Regulations, Title 22, section 98101.

14         179.    If the District had not administered the policies described in Paragraph 177 above, in

15  a discriminatory manner, Plaintiffs would not have been deprived of their right to full and equal

16  access to educational opportunities within District schools, or would not have been subjected to

17  discrimination under such programs or activities, on the basis of race.

18         180.    Furthermore, as set forth in Paragraphs 40 through 44 and 49 through 102 above,

19  Plaintiffs have been and continue to be subjected to racial harassment by White students through

20  the use of racial slurs, racially derogatory comments, negative racial stereotypes, and through

21  threats of violence and actual acts of physical violence directed toward Plaintiffs.

22         181.    District officials had actual notice that the harassment based on race was so severe,

23  pervasive and objectively offensive that it created a hostile climate based on race that deprived

24  Plaintiffs full and equal access to educational opportunities within District schools, in violation of

25  Plaintiffs' rights under California Government Code section 11135.

26         182.    The racial harassment described in Paragraphs 40 through 44 and 49 through 102

27  above, took place in schools administered by the District, and the District had the authority to

28  discipline students and employees who racially harassed Plaintiffs.  Despite the District's duty to

44

take prompt, timely and reasonable measures to end the racial harassment, the District turned a blind eye toward the harassment and allowed it to persist unabated.  The District's acts or omissions constitute deliberate indifference toward Plaintiffs and caused Plaintiffs to be subjected to the racial harassment described above.  The District has therefore violated and continues to violate California Government Code section 11135.

183.    As set forth in Paragraph 177 above, Jessica K. and Ashley W. have been and continue to be subjected to sexual harassment through the use of sexually explicit verbal taunts and comments and unwelcome physical touching of a sexual nature.

184.    District officials had actual notice that the harassment based on sex was so severe, pervasive, and objectively offensive that it created a hostile climate based on sex that deprived Jessica K. and Ashley W. full and equal access to educational opportunities within District schools, in violation of Plaintiffs' rights under California Government Code section 11135.

185.    The sexual harassment described in Paragraphs 45 through 47 and 103 through 115 above, took place in schools administered by the District and the District had the power to discipline students and teachers who sexually harassed Plaintiffs.  Despite the District's duty to take prompt, timely, and reasonable measures to end the sexual harassment, the District turned a blind eye toward the harassment and allowed it to persist unabated.  The District's acts or omissions constitute deliberate indifference toward Plaintiffs and caused Plaintiffs to be subjected to the sexual harassment described above.  The District has therefore violated and continues to violate California Government Code section 11135.

186.    Plaintiffs are entitled to injunctive relief to enjoin the District's violation of California Government Code section 11135.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief against Defendants:

1.    For an order declaring that Defendants Eureka City Schools District and Eureka City Schools District School Board have been deliberately indifferent to known acts of discrimination and harassment on the basis of race, and that the discrimination was so severe, pervasive, and objectively offensive that it effectively barred Plaintiffs access to an educational

1   opportunity or benefit in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C.

2   section 2000d *et seq.*;

3         2.      For an order declaring that Defendants Eureka City Schools District and Eureka

4   City Schools District School Board have been deliberately indifferent to known acts of

5   discrimination and harassment on the basis of sex, and that the discrimination was so severe,

6   pervasive, and objectively offensive that it effectively barred Jessica K. and Ashley W. access to an

7   educational opportunity or benefit in violation of Title IX of the Education Amendments of 1972,

8   20 U.S.C. section 1681(a);

9         3.      For an order declaring that Defendants Eureka City Schools District and Eureka

10   City Schools District School Board have been deliberately indifferent to known acts of

11   discrimination and harassment on the basis of race in violation of the Equal Protection Clause of

12   the Fourteenth Amendment to the United States Constitution;

13         4.      For an order declaring that Defendants Eureka City Schools District and Eureka

14   City Schools District School Board have been deliberately indifferent to known acts of

15   discrimination and harassment on the basis of sex in violation of the Equal Protection Clause of the

16   Fourteenth Amendment to the United States Constitution;

17         5.      For an order declaring that Defendants Eureka City Schools District and Eureka

18   City Schools District School Board have violated Title II of the ADA and Section 504 of the

19   Rehabilitation Act;

20         6.      For an order declaring that Defendants Eureka City Schools District and Eureka

21   City Schools District School Board, through their agents and employees, and Defendants in their

22   individual capacities have violated the Unruh Civil Rights Act, California Civil Code section 51 *et*

23   *seq.*;

24         7.      For an order declaring that Defendants Eureka City Schools District and Eureka

25   City Schools District School Board, through their agents and employees, have violated California

26   Government Code section 11135;

27         8.      For an order awarding Jessica K. compensatory damages against Defendant Eureka

28   City Schools District pursuant to the provisions of Section 504 of the Rehabilitation Act;

46

9.      For an order awarding Alexis R. compensatory damages against Defendant Eureka City Schools District pursuant to the provisions of Section 504 of the Rehabilitation Act;

10.     For an order awarding Jessica K. statutory damages against Defendants Fullerton, Taplin, Davis, Beck, Johnson, Van Vleck, Alexander, Schmidt, Scott, Goddi, Jordan, and Perry, $4,000 for each violation of the Unruh Civil Rights Act, pursuant to the provisions of California Civil Code section 52;

11.     For an order awarding Ashley W. statutory damages against Defendants Fullerton, Taplin, Davis, Beck, Johnson, Van Vleck, Alexander, Schmidt, Scott, Goddi, Jordan, and Perry, $4,000 for each violation of the Unruh Civil Rights Act, pursuant to the provisions of California Civil Code section 52;

12.     For an order awarding Alexis R. statutory damages against Defendants Fullerton, Taplin, Davis, Beck, Johnson, Van Vleck, Alexander, Schmidt, Scott, Goddi, Jordan, and Perry, $4,000 for each violation of the Unruh Civil Rights Act, pursuant to the provisions of California Civil Code section 52;

13.     For an order awarding Anthony J. statutory damages against Defendants Fullerton, Taplin, Davis, Beck, Johnson, Van Vleck, Alexander, Schmidt, Scott, Goddi, Jordan, and Perry, $4,000 for each violation of the Unruh Civil Rights Act, pursuant to the provisions of California Civil Code section 52;

14.     For a permanent injunction restraining and enjoining Defendants Eureka City Schools District and Eureka City Schools District School Board, Fullerton, Taplin, Davis, Beck, Johnson, Van Vleck, Alexander, Schmidt, Scott, Goddi, Jordan, and Perry, from failing to adequately protect Plaintiffs Jessica K., Ashley W., Alexis R. and Anthony J., and other similarly situated students, from verbal and physical harassment and discrimination on the basis of their race within the District;

15.     For a permanent injunction restraining and enjoining Defendants Eureka City Schools District and Eureka City Schools District School Board, Fullerton, Taplin, Davis, Beck, Johnson, Van Vleck, Alexander, Schmidt, Scott, Goddi, Jordan, and Perry, from failing to

47

1 │ adequately protect Jessica K. and Ashley W., and other similarly situated students, from verbal and

2 │ physical harassment and discrimination on the basis of their sex within the District;

3 │     16.    For a permanent injunction ordering Defendants Eureka City Schools District and

4 │ Eureka City Schools District School Board, Fullerton, Taplin, Davis, Beck, Johnson, Van Vleck,

5 │ Alexander, Schmidt, Scott, Goddi, Jordan, and Perry, to stop engaging in unconstitutional and

6 │ unlawful acts, and to develop policies and procedures for ending any such unconstitutional and

7 │ unlawful acts and the hostile and intolerant environment, including but not limited to the following:

8 │     (a)    Require Defendants Eureka City Schools District and Eureka City Schools

9 │ District School Board to implement mandatory and effective training programs for District

10 │ faculty, staff, and students on issues relating to racial and sexual discrimination, and

11 │ methods to intervene to stop students from harassing other students based on race or sex;

12 │     (b)    Require Defendants Eureka City Schools District and Eureka City Schools

13 │ District School Board to adopt policies with specific guidelines for instructing teachers,

14 │ security guards, hall monitors, and administrators about how to address complaints by

15 │ students who have been subjected to trauma, taunted, harassed, or discriminated against

16 │ because of their race or sex;

17 │     (c)    Require Defendants Eureka City Schools District and Eureka City Schools

18 │ District School Board to conduct assemblies for all students in the District addressing issues

19 │ of diversity and tolerance, wherein students are instructed about laws prohibiting

20 │ harassment and discrimination based on their race or sex;

21 │     (d)    Require Defendants Eureka City Schools District and Eureka City Schools

22 │ District School Board to assign a peer mediator and/or other staff member to District

23 │ schools to provide active monitoring for the schools and to address instances of harassment

24 │ and discrimination that arise at the schools;

25 │     (e)    Require Defendants Eureka City Schools District and Eureka City Schools

26 │ District School Board to collect and maintain statistical data concerning each complaint of

27 │ harassment based on race or sex made by a student, as well as the specific action district

28 │

1    principals, assistant principals, teachers, security guards, and administrators took to resolve

2    the complaint;

3              (f)    Require Defendants Eureka City Schools District and Eureka City Schools

4    District School Board to collect and maintain statistical data concerning the racial

5    demographics of students who are transferred to county community or other alternative

6    schools, and to analyze and take steps to reduce the racial disproportionality of such

7    transfer decisions;

8         17.    For a permanent injunction ordering Defendants Eureka City Schools District and

9    Eureka City Schools District School Board to end the practice of pushing out Native American

10   students to county community schools and other alternative schools where the students do not meet

11   the criteria for referral to a county community school or other alternative school;

12        18.    For an order awarding Plaintiffs their expenses and costs, including reasonable

13   attorneys' fees;

14        19.    For an order awarding each Plaintiff prejudgment interest and postjudgment interest;

15   and

16        20.    For an order awarding such other and further relief as the Court deems just and

17   proper.

18                              **DEMAND FOR JURY TRIAL**

19        Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all

20   issues triable to a jury.

21   DATED:  December 18, 2013          JORY C. STEELE
                                        LINNEA L. NELSON
22                                      AMERICAN CIVIL LIBERTIES UNION
                                        FOUNDATION OF NORTHERN CALIFORNIA, INC.
23
                                        MICHAEL HARRIS
24                                      NATIONAL CENTER FOR YOUTH LAW

25                                      JOSÉ R. ALLEN
                                        CARRIE LEROY
26                                      PRO BONO COUNSEL

27                                      Attorneys for Plaintiffs

28                                      By:  ___/s/ JOSÉ R. ALLEN_____

                                   49