**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSICA K., by and through her guardian ad litem BRIANNA K.; ASHLEY W., by and through her guardian ad litem CLEO W.; ANTHONY J., by and through his guardian ad litem MAYA J.; and ALEXIS R., by and through her guardian ad litem ANNA R., <br><br> Plaintiffs, <br><br> v. <br><br> EUREKA CITY SCHOOLS DISTRICT; JOHN FULLERTON, FRAN TAPLIN, WENDY DAVIS, HENRY BECK, SUSAN JOHNSON, Members of the Eureka City Schools District School Board; FRED VAN VLECK, Superintendent of Schools for Eureka City Schools District; LAURIE ALEXANDER, Director of Student Welfare and Attendance; JAN SCHMIDT, Principal, Zane Middle School; DENNIS SCOTT, Principal, Zane Middle School; RONALD PERRY, Vice Principal, Zane Middle School; RICK JORDAN, Principal, Eureka High School; MARTIN GODDI, Vice Principal, Eureka High School; and DOES 1 through 100, inclusive, <br><br> Defendants. | No. C 13-05854 WHA <br><br> **ORDER RE MOTION TO PROCEED UNDER FICTITIOUS NAMES AND RELATED MOTIONS** |

**INTRODUCTION**

In this civil rights action asserting discrimination claims under federal and state laws, plaintiff students move (1) to proceed under fictitious names, and (2) to seal in part various documents, including their attorney declarations, their applications for guardians *ad litem*, their own declarations, and excerpts of their deposition testimony. Moreover, defendants move (3) to take judicial notice of documents in opposition to plaintiffs' motions, and (4) to seal those documents as well as excerpts of plaintiffs' deposition testimony.

**STATEMENT**

Plaintiffs are four middle school and high school students from the Eureka City Schools District. In the complaint filed last December 18, plaintiffs identify themselves as Jessica K., a thirteen-year-old eighth-grader, Anthony J., a fourteen-year-old ninth-grader, Ashley W., a fifteen-year-old ninth-grader, and Alexis R., a sixteen-year-old eleventh-grader. The complaint further identifies them as either African American or Native American, with two having learning and physical disabilities. It also alleges that plaintiffs have experienced years of intentional discrimination in their schools on account of race, sex, and disability status. Defendants are the Eureka City Schools District, members of its school board, and several district staff members.

Plaintiffs now move to proceed under fictitious names, largely because they say they fear retaliation if their true identities are used (the complaint was filed using fictitious names). On January 16, both sides were heard. Because the fear-of-retaliation claim was not supported by any declarations from plaintiffs or their guardians *ad litem*, the Court allowed leave to file such declarations after the hearing, to be followed up by depositions taken by the other side. Both sides then submitted additional briefing and record, followed by a second hearing.

**ANALYSIS**

1.  **THE MOTION TO PROCEED UNDER FICTITIOUS NAMES.**

It would be an exercise in futility to expect this case to be litigated even through the summary judgment stage, much less trial, without plaintiffs' true identities becoming known, no matter how much effort were made to conceal them. The complaint alleges that the harassment by plaintiffs' classmates has gone unabated, despite complaints to school officials. To prove

this, plaintiffs will have to prove up the harassment — which will mean naming names and testifying at depositions (and trial) to the "who, what, when, where, and how" of the alleged harassment. Furthermore, plaintiffs will need to testify to their grievances to school officials and, in turn, the retaliation taken against them by other students — again naming names, times, places, and circumstances. To meet all these allegations, defendants will need to interview and depose witnesses including, of course, the students accused of harassment. It will be necessary to use real names in these questions in order to get at the truth. If alleged harassers were merely asked, "Did you hit 'Jessica'," a false name, then the alleged harasser could deny it. To be fair to the interviewee or the deponent (who, after all will be under oath and subject to penalty of perjury), real names will be needed. Moreover, it would eventually become obvious from the nature of the questioning who the complaining parties are, even if fictitious names were used from the outset.

Federal Rule of Civil Procedure 5.2 already restricts the names of minor individuals to their actual initials (but this does not apply to the names of guardians *ad litem*). Given the reportedly small size of African American and Native American populations in Eureka, plaintiffs are concerned that they will be identified if their actual initials or their guardians *ad litem*'s names are used. No doubt, this is true. Therefore, plaintiffs ask to proceed under fictitious names.

In deciding whether to permit a party to use fictitious names in shielding themselves from retaliation, a district court must consider five factors. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1068 (9th Cir. 2000). The factors are:

> (1) the severity of the threatened harm, (2) the reasonableness of the anonymous party's fears, . . . (3) the anonymous party's vulnerability to such retaliation, (4) the prejudice to the opposing party, and (5) the public interest.

As both sides agree that these factors determine whether plaintiffs may proceed anonymously, the order begins with the last of the five factors, as did our court of appeals in *Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate*, 596 F.3d 1036, 1042 (9th Cir. 2010).

3

### A.  Public Interest.

"In this circuit, the common law rights of access to the courts and judicial records are not taken lightly," and there is a "strong general presumption that plaintiffs will conduct litigation under their own names." This is in part because the "public interest in understanding the judicial process has supported our general history of access." *Id.* at 1042–43 (internal citations omitted); *see also Kamakana v. City of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006). The order therefore finds that the public interest factor weighs in favor of truth in pleading.

Plaintiffs advance several points. *First*, plaintiffs argue that the public interest in knowing their identities is minimal because their identities are not central to their discrimination claims. This is untrue. As discussed above, plaintiffs' actual identities *are* central to their claims. *Second*, plaintiffs "*may* be unwilling to proceed with the litigation at all" if their true identities are used; the public interest in resolving claims on the merits thus weighs in favor of anonymity, at least in plaintiffs' view (Nelson Decl. ¶ 9) (emphasis added). That plaintiffs "may be" unwilling to proceed with this matter is insufficient. "May be" is too wishy-washy and speculative. *Third*, plaintiffs assert that using their true identities "could have a 'chilling effect' on this case or other cases involving discrimination in schools in California." "Could have" does not translate to "will have." This again is speculation. Our federal courts have a proud and long history of children challenging race discrimination in the schools, using their real names.

### B.  Plaintiffs' Vulnerability to Retaliation.

It is undisputed that plaintiffs are vulnerable to retaliation, in light of their young age as middle school and high school students. *Kamehameha* recognized that "the youth of these plaintiffs [is] a significant factor in the matrix of considerations arguing for anonymity." 596 F.3d at 1045 (internal citations omitted). Moreover, defendants make no argument as to this factor in their opposition. Nevertheless, even though plaintiffs' vulnerability supports the use of fictitious names, this factor alone does not outweigh the other factors against anonymity.

### C.  Severity of the Threatened Harm and Reasonableness of Plaintiffs' Fears.

Under the guidance of our court of appeals, these two factors — regarding the severity of the threatened harm and the reasonableness of plaintiffs' fears — "are intricately related and

4

1  should be addressed together." The order thus does so now, recognizing that for plaintiffs to
2  proceed anonymously, they must show that they "reasonably fear severe harm." *Id.* at 1043.
3     To this end, three plaintiffs and their guardians *ad litem* submitted post-hearing
4  declarations, stating that they fear physical and social retaliation if their true identities are
5  revealed. Plaintiff Jessica K., for example, declared that she is afraid that other students will
6  physically retaliate against her if she is publicly identified, "especially since students have
7  already physically retaliated against [her] for complaining about racial harassment." Jessica
8  explained that in January 2013, after she "had complained many times" to school officials, the
9  principal and vice-principal punished another student for racially harassing Jessica. The
10 punished student had threatened to beat up Jessica, and "[t]he harassment got worse almost
11 immediately after [the student] was punished," with other students calling Jessica a "snitch" and
12 the punished student telling Jessica, "You better not tell anyone I got suspended" when she gave
13 Jessica an apology letter as part of her punishment. Jessica further declared (Jessica K. Decl. ¶¶
14 3–12, 14):

> In early 2013, when I was in the locker room changing for P.E., [the punished student] shoved my head into a locker, banging my temples against the sides of the locker. It hurt a lot, and she and her friends just laughed at me. It made me afraid to complain anymore, because I was afraid of being attacked again, and because my complaints only made the harassment worse . . . . In March 2013, I found a note in my backpack from another student that said, "Shut the fuck up." That same day, a boy pushed me in the hallway and I injured my ankle so badly that I had to wrap it.

20    Plaintiff Anthony J. also declared that other students increasingly harassed him after he
21 and his grandmother complained to school officials. During the 2011–2012 school year — two
22 school years ago — one student who had directed racial slurs at Anthony tripped him on the
23 school basketball court, causing him to cut his leg and develop a serious infection.
24 The following school year, a student who called Anthony the N-word also told him, "I'm going
25 to kick your ass." Another student also purportedly "retaliated against" Anthony by coming up
26 to him and yelling, "[D]on't tell on me anymore" (Anthony J. Decl. ¶¶ 5–11). Furthermore, in a
27 deposition following his declaration, Anthony testified that he received an anonymous phone call
28 on January 26, during which he was called the N-word several times and told by the caller that

5

"they were going to burn a cross in [Anthony's] front yard." The caller's identity remains unknown, as the call was listed as "private" on Anthony's cell phone and Anthony had not heard the caller's voice before (the call also was not recorded) (Nelson Exh. 2 at 23:14–24:23).

When these declarants were deposed, however, their testimony softened, indeed changed, and mitigating circumstances were revealed. While Jessica's declaration stated that she felt threatened a year ago when the punished student gave her the apology letter and said, "You better not tell anyone I got suspended," Jessica testified at her deposition that *she did not remember* what the punished student said when giving her the letter (Mitchell Exh. A at 22:13–21). Jessica also did not suspect retaliation as the motive underlying the "Shut the fuck up note" or the incident involving the locker, as she admitted not knowing why someone put that note in her backpack or why the punished student shoved her head into the locker (Nelson Exh. 1 at 32:8–15; Mitchell Exh. A at 29:13–17). Significantly, and more recently throughout the fall semester of 2013, she and the punished student played on the same basketball team without the punished student ever threatening Jessica "in any way." In fact, Jessica conceded at her deposition that she was "[n]ot really" afraid of the punished student when playing basketball with her this past year. Moreover, Jessica's guardian *ad litem* — Brianna K. — has already told her parents, sisters, and two friends about her and Jessica's involvement as plaintiffs in this lawsuit. The order thus finds that the above testimony undercuts the reasonableness of any fear that plaintiffs will be physically harmed if their true identities are used herein (Mitchell Exh. A at 29:13–30:20; 32:7–15; Mitchell Exh. D at 7:21–8:17).

As for Anthony, he declared originally that a student had threatened to retaliate against him — pointing to the instance in which that student yelled, "[D]on't tell on me anymore." But in contradiction to that declaration, Anthony testified at his deposition that no one at his two schools had threatened to physically harm him if he complained about being harassed or bullied. Anthony also explained that the student who said, "I'm going to kick your ass," did so because Anthony himself had hit that student's cousin. This fact was not revealed in his declaration. That student, moreover, never did "kick his ass." Anthony further stated that he is not afraid of any student at school (Mitchell Exh. B at 10:17–11:24; 18:8–20:16; 22:23–23:1).

6

With regard to Anthony's anonymous phone call, plaintiffs submit that this was a threatening call that occurred in "close proximity in time" to the complaint's filing, thereby suggesting that the call was in retaliation for plaintiffs' participation in this action. While the call is disturbing, as described by Anthony, the present record supports only a tenuous connection between the call and this action.

None of the details that Anthony provided about this call relates to his discrimination complaints, either at school or in this lawsuit. Anthony also testified that he had no idea who made the call, and that he had never heard the caller's voice before. Additionally, the call took place more than five weeks after the complaint's filing, thus undermining the "close proximity in time" that plaintiffs allege (Nelson Exh. 2 at 23:14–24:23). The circumstances are too vague and remote to find that the call was retaliation for this suit.

Finally, plaintiff Ashley W. testified in her deposition that as to retaliation, her "sole concern is being shunned by other students," not physical harm (Mitchell Exh. C at 18:2–9).

In sum, the threats have *not* been as severe and persistent as counsel portrayed. This record shows that some harassment likely occurred (not necessarily in response to this lawsuit), but that the risk of physical retaliation is substantially less severe than claimed by counsel. This order so finds.

*Kamehameha* is instructive. Our court of appeals there found no abuse of discretion in the district court's conclusion that the plaintiffs' fears were unreasonable. This was so even though the plaintiffs were children, and there were threats of "kill haole day everyday" and online postings about how the plaintiffs were "jus gonna get lickins everyday" once their true identities were revealed. As *Kamehameha* explained, the district court correctly recognized that people often say things online with no intention of carrying those things out, that many of the postings were also accompanied by statements supporting non-violence, and that the plaintiffs themselves conceded that they were not fearful of retaliation or ostracism at their school. *Id.* at 1040–45. To be clear, it is reasonable for plaintiffs to fear shunning and resentment from their lawsuit. It is not reasonable, however, to expect severe physical retaliation.

7

Nevertheless, plaintiffs argue that their privacy interests warrant fictitious names, due to their fear that they will be publicly connected to sensitive information and suffer embarrassment and humiliation as a result. Although the *Advanced Textile* factors do not explicitly consider such privacy interests, our court of appeals stated that "a party may preserve his or her anonymity in judicial proceedings in special circumstances when *the party's need for anonymity* outweighs prejudice to the opposing party and the public's interest in knowing the party's identity." 214 F.3d at 1068 (emphasis added). According to plaintiffs, the sensitive information to be litigated will include alleged incidents of racial and sexual discrimination, such as classmates taunting Jessica that she is a "stripper, "whore," and "hooker" because she is African American (Compl. ¶ 51). Both the complaint and plaintiffs' declarations also describe plaintiffs' depression, anger, and social withdrawal as a result of the alleged discrimination, as well as the learning and physical disabilities of two plaintiffs (Jessica K. Decl. ¶¶ 13, 14; Anthony J. Decl. ¶ 12). In this connection, Ashley has raised an important privacy point that will not be described in this order, but will be addressed in a separate protective order under seal in which direct relief will be given.

While this order is sympathetic to concerns over the release of such information in connection with their true names, plaintiffs have not shown a sufficient, severe harm, or that they reasonably fear such harm. As a result, this cuts against plaintiffs' motion for fictitious names.

### D. Prejudice to Defendants.

The order next considers prejudice to defendants if fictitious names are used. According to plaintiffs, any such prejudice would be minimal because plaintiffs are willing to reveal their true identities to defendants for the sole purpose of litigation. Plaintiffs propose the use of fictitious names and redactions to hide their true identities, as well as a protective order. *See, e.g.*, *Doe v. Cnty. of El Dorado*, 2:13-CV-01433-KJM, 2013 WL 6230342, *5 (E.D. Cal. Dec. 2, 2013). Among other things, the proposed protective order would require defendants to do the following when they interview third parties and determine that disclosure of plaintiffs' true names is needed to further the interview's purpose (Supp. Br. 3):

8

> (1) [I]nstruct the witness that the Court has ordered that [p]laintiffs' names be kept confidential; (2) request that the nonparty witness keep the [p]laintiffs' names confidential; and (3) inform the witness that retaliation against an individual for participating in litigation or reporting discrimination is unlawful and will not be tolerated by [d]efendants.

Defendants respond that a protective order would be unworkable here because this matter likely involves extensive discovery directed at third parties, such as school children. Defendants also assert that redaction of plaintiffs' identifying information from all produced documents would be unduly burdensome.

This order agrees with defendants. It would be most impracticable to expect deponents or interviewees — such as classmates who allegedly harassed plaintiffs or witnessed such claimed events — to attend depositions and then keep the contents of such depositions secret (from their parents, counsel for the families, and friends) or to keep mum about who they think is accusing them. Indeed, to defend themselves, defendants must in their investigations and depositions ask point blank whether the alleged harasser did the accused things to specific victims, naming names. To do otherwise would skirt the questions that need to be asked. Remember, the witnesses will be under oath and subject to penalty of perjury. They need to answer questions that tie into the real facts, not fictional facts.

Given that plaintiffs' actual names would be a secret that could not be kept, we should not saddle defense counsel and defendants with the burden of onerous obligations bound to fail and subject them to possible contempt proceedings for it. Again, by due process, defendants are entitled to meet the allegations against them by interviewing witnesses, who will likely figure out from the nature of the questioning the identities of plaintiffs and the accused harassers (even if the interview questions were designed to try to keep such identities confidential). To the limited extent plaintiffs' proposed regime might succeed in keeping something secret, moreover, it would lead to anxiety and speculation by those not actually accused but who might think they are, and by their parents, no one knowing for sure who is being blamed herein for the alleged wrongs. It is better to be clear on who reportedly did what to whom and get to the bottom of those specifics rather than impose a cloud of suspicion and worry over the Eureka school

community at large.  In short, the prejudice to defendants cuts against plaintiffs' use of fictitious names.

\*          \*          \*

Balancing all of the foregoing factors, the weight of all considerations favors an open proceeding and militates against use of fictitious names.  The motion is thus **DENIED**, subject to the last paragraph of this order.

### 2.     A MORE DIRECT REMEDY.

The Court prefers a more direct remedy.  Upon motion by either side, the Court will hold a hearing (in Eureka, if possible) to require any harassing person — upon a proper showing — to appear and show cause as to why he or she should *not* be placed under a restraining order, enforceable by the contempt power of the district court, to discontinue such conduct (allowing said person to be heard as to whether or not he or she engaged in the harassment in the first place).  After hearing, if good cause warrants a restraining order, one will be issued to protect any plaintiff requesting such relief, enforceable by the contempt power of the district court.  The Court has more confidence in the efficacy of a restraining order to stop harassment than in the regime of fictitious names and secrecy obligations proposed by plaintiffs' counsel.  To tee up any such hearing, it would be necessary for counsel to submit a proposed summons and court order to which any alleged harasser, as described above, would be subjected, and to propose a hearing date and time.  Upon a prima facie showing, an order to show cause will issue.

### 3.     THE MOTIONS TO SEAL ATTORNEY DECLARATIONS, APPLICATIONS FOR GUARDIANS *AD LITEM*, DECLARATIONS, AND DEPOSITION TESTIMONY.

Also pending are motions to seal plaintiffs' attorney declarations, their applications for guardians *ad litem*, their own declarations, and excerpts of their deposition testimony.  Because all of these motions stem from plaintiffs' motion to use fictitious names, these motions are also **DENIED**, subject to the last paragraph of the order.

### 4.     THE MOTIONS TO TAKE JUDICIAL NOTICE AND TO SEAL DOCUMENTS IN OPPOSITION TO PLAINTIFFS' MOTIONS.

Finally, defendants move to take judicial notice of documents in support of their opposition and to seal those documents (Dkt. No. 22).  In brief, these opposition documents

1  relate to students' education records and claims under various sections of the California
2  Government Code. The order, however, does not rely on any of these documents in determining
3  plaintiffs' motions. Nor are the claims under the California Government Code central to the
4  complaint.

5  As such, the parties are requested to provide supplemental briefing on how defendants'
6  motion to seal documents concerning the claims under the California Government Code should
7  be resolved, subject to the next paragraph. Defendants' motion to take judicial notice, however,
8  is **DENIED AS MOOT**.

## CONCLUSION

For the reasons stated above, defendants' motion to take judicial notice is **DENIED AS MOOT**. As to defendants' motion to seal documents concerning claims under the California Government Code, the parties are requested to provide supplemental briefing on how this motion should be resolved, addressing for instance whether defendants would like to withdraw their motion to seal these documents and have such documents removed from the courthouse (Dkt. No. 22). This supplemental briefing should be no longer than three pages per side, and is due by **5 PM ON FEBRUARY 28, 2014**.

Plaintiff's motion to proceed under fictitious names and the remaining motions to seal are **DENIED**, subject to the following. For purposes of testing the pleadings, and on assumption that defendants will move under Federal Rule of Civil Procedure 12, the Court will allow plaintiffs' fictitious names to remain in the pleadings for the time being. To the extent, however, that the pleading survives Rule 12 practice, or to the extent that defendants choose to answer rather than move under Rule 12, then at that point, plaintiffs must re-file their complaint, identifying their true names (or initials in the case of minors).

**IT IS SO ORDERED.**

Dated: February 21, 2014.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE